E. W. BLISS COMPANY, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 35729.

United States District Court
N. D. Ohio, E. D.
June 25, 1963.

James C. Davis, Laurence E. Oliphant, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, Richard Hawkins, James P. Murtagh, Chester C. Davis, John E. Terzis, Simpson, Thacher, & Bartlett, New York City, for plaintiff.

Russel E. Ake, Merle M. McCurdy, Cleveland, Ohio, John B. Jones, Jr., First Asst. Atty. Gen., Edward S. Smith, Jerome Fink, Peter Ciano, Solomon Fisher, Dept. of Justice, Washington, D. C., for defendant.

McNAMEE, District Judge:

This is an action by The E. W. Bliss Company, a Delaware corporation, (hereinafter Bliss) against the Government to recover an alleged overpayment of corporate income taxes for the year 1951. The alleged overpayment was made pursuant to a statutory notice of deficiency issued by the Commissioner of Internal Revenue on June 10, 1959. On September 2, 1959, plaintiff paid the alleged deficiency in the amount of $621,983.30, together with interest from March 15, 1952 in the sum of $278,622.96. The notice of deficiency included various adjustments to the income shown on plaintiff's income tax return for 1951. The two adjustments challenged by the plaintiff in this action are:

(1) An adjustment increasing income in the sum of $1,125,600 by disallowing a so-called "write-down" by the plaintiff of its inventory of work in process; this adjustment increased the income tax shown on plaintiff's return by $571,242.00.

(2) An adjustment increasing income in the sum of $100,129.96 as a result of refunds of New York State franchise taxes received by the plaintiff; the effect of this adjustment was to increase plaintiff's income tax in the amount of $50,815.95.

Plaintiff seeks to recover the entire amount of the additional tax and interest paid by reason of the adjustments relating to the inventory of work in process. Plaintiff concedes that $844.94 of the adjustment relating to the refund of franchise tax is correct. This operates to reduce the plaintiff's claim on the latter adjustment by the sum of $428.80. The aggregate sum sought to be recovered on both adjustments, including interest paid to September 2, 1959, is $900,-093.94, plus interest from September 2, 1959, the date of payment by plaintiff.

Bliss is a manufacturer of machine tools of various types and dimensions. Many of the machine tools manufactured by Bliss consist of rolling mills and huge presses used in the manufacture of steel and fabrication of steel products. These products of plaintiff were manufactured and sold on a custom basis in accordance with orders placed and specifications furnished by its customers. The price of the presses made to individual orders was fixed before work thereon commenced and ranged between a few thousand dollars and hundreds of thousands of dollars for each press. In 1951 Bliss had manufacturing plants at Hastings, Michigan, Toledo, Ohio, Salem, Ohio and Canton, Ohio. The Canton plant was organized in 1950 but its first full year of operation was in 1951. Bliss also did business in New York state. Plaintiff's securities are listed on the New York Stock Exchange and it has a large number of shareholders. Its financial reports are subject to the juridsiction of the Securities and Exchange Commission and the regulations of the New York Stock Exchange. Plaintiff's books of account are kept on an accrual basis. For more than 25 years its books of account have been audited by Arthur Young & Company and its predecessor firm. Arthur Young & Company is one of the eight largest and most prominent firms of certified public accountants in the United States. It is plaintiff's position that its inventory of work in process was valued in accordance with the best accounting practices in the trade or business and clearly reflected its income as required by the applicable law and regulations. The Government justifies its disallowance of the write-down of the inventory on the ground that generally plaintiff's method of valuing the work in process as of December 31, 1951 was contrary to law and did not "most clearly reflect income." The franchise tax issue arises because of the Government's contention that the refund of franchise tax received by plaintiff in 1951 accrued in that year while plaintiff contends that such refund accrued in 1944. These issues will be discussed in the order stated above.

## INVENTORY OF WORK IN PROCESS

At the end of 1951 plaintiff computed the value of its inventory of work in process on the basis of cost or market, whichever was lower, as permitted by Regulation 111–29.22(c) 2. The method adopted was to accumulate all direct costs of each job more than 50% complete. To this amount was added the estimated cost of completion. The total cost of each press as thus determined was then compared with the sale price of presses manufactured at Canton, Ohio, less an allowance of 15% for gross profit margin and the sale price of presses manufactured at Toledo, less a gross profit margin of 20%. If the projected cost of a completed press exceeded 80 or 85% of the sale price, the excess was eliminated from the inventory and the resulting reduced value represented the market value of the inventory as of the end of the current year. The evidence shows that it is practicable to make an approximately correct estimate of the cost to finish a job more than 50% complete. It is unlikely at that stage of manufacture that the expense of completing the job will involve any excessive cost. The addi-

tion therefore of normal costs to complete a job causes no increase in the excessive costs, if any, that were in the inventory at the end of the year. Consequently, if the actual cost at the end of the year plus the estimated cost to complete exceeds the normal cost of 80 or 85% of the sale price, the excess is properly attributable to the inventory as of December 31, 1951 and eliminated therefrom to determine market value as of the inventory date. All but a very small portion of the write-down of the inventory of December 31, 1951 related to the unfinished presses at the Canton plant as of that date. The amount of the write-down at that plant was $1,018,000. Six months later when all of the unfinished presses of 1951 were completed, the actual costs of completion were found to be $1,037,000 in excess of 85% of the selling price, a difference of but $19,000, or less than a 2% variance from the additional cost to complete as determined originally. This confirmed with substantial accuracy the estimate of the cost to complete and indicates that plaintiff's method of determining excess costs and market value is a reasonable one. The tax law and generally accepted principles of accounting recognize that substantial accuracy is the objective to be achieved and that in many situations exact determinations are neither practicable nor necessary. Huntington Securities Corporation v. Busey, 112 F.2d 368, (6th Cir. 1940).

The above method of computing inventory has been applied by plaintiff under the direction of Arthur Young & Company since about 1935.

The issues arising from the write-down of inventory are governed by Section 22(c) of the Internal Revenue Code of 1939 and the pertinent regulations promulgated thereunder. Section 22(c) reads:

"(c) *Inventories*. Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

Regulation 111–29.22 (c) 2 (hereafter Reg.(c) 2), in pertinent part, reads:

"Section 22(c) provides two tests to which each inventory must conform:

"(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

"(2) It must clearly reflect the income.

"It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with these regulations. An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income.

"The bases of valuation most commonly used by business concerns and which meet the requirements of section 22(c) are (a) cost and (b) cost or market, whichever is lower. * * * *"

██ Plaintiff carries the burden of establishing that the Commissioner acted arbitrarily in disallowing the so-called write-down of plaintiff's inventory of work in process. Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 50 S. Ct. 263, 74 L.Ed. 848; Lenox Clothes Shops v. Commissioner, 6 Cir., 139 F.2d 56; Finance & Guaranty Co. v. Commis-

sioner, 4 Cir., 50 F.2d 1061. Plaintiff contends that its inventory of work in process is computed without regard to tax considerations and is used primarily for balance sheet purposes to inform its shareholders and the public of its true financial position. As shown above, by the express terms of Reg. (c) 2, as a general rule, such an inventory may be regarded as clearly reflecting income. Plaintiff emphasizes the requirement of Regulation (c) 2 that "greater weight is to be given to consistency \* \* \*." Certainly, if plaintiff's method of valuing its inventory of work in process is substantially in accord with the regulations, great weight must be given to its long record of consistent application of the same method. To sustain the propriety of its method, plaintiff also relies upon the provision in Regulation (c) 2 that uniformity of inventory rules is not contemplated but effect must be given to "trade customs which come within the scope of the best accounting practices in the particular trade or business."

▆▆▆ Regulation 111–29.22(c) 4, (hereafter Regulation (c) 4) defines "market" thus:

"Under ordinary circumstances and for normal goods in an inventory, market means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which it is usually purchased by the taxpayer and is applicable in the cases (a) \* \* \* \* \* \* \* \* \* \* \* \*, (b) of the basic elements of cost (material, labor and burden) of goods in process except such as are manufactured under firm sale contracts (i. e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory under which the taxpayer is protected against actual loss, which goods must be inventoried at cost."

Asserting that "current bid price" as used in Regulation (c) 4 means replacement value, the Government contends that plaintiff does not ascertain the replacement value of its goods in process and consequently its determination of market value is erroneous. The definition of market value in Regulation (c) 4 is by its terms applicable only in "ordinary circumstances and for normal goods in an inventory." Plaintiff contends that it does not engage in the repetitive manufacture of products and that the items in its work in process inventory are not normal goods. Plaintiff's argument in this regard is not wanting in merit.

"Normal" derives from the word "norm" which means—"A rule or authoritative standard; model; type; pattern." (Webster's New International Dictionary, 2nd Ed.). According to the same lexicographer, the word "normal" means—"According to, constituting, or not deviating from, an established norm, rule, or principle; conformed to a type, standard, or regular form; performing the proper functions; not abnormal; \* \* \*." The presses manufactured by the plaintiff at its Hastings plant are normal goods. They conform to a common type or pattern. Each press manufactured at that plant is essentially the same in design, size and function and is offered to the public generally at the same price. Mass production methods can be and are employed in the manufacture of presses at the Hastings plant. The presses manufactured at the Toledo and Canton plants are radically different. They are not of a standard or common type but are of unique and unusual design, extraordinary dimensions and are manufactured according to the specifications of the purchaser. Each of these custom built presses, some of which are four stories in height, are distinctive and they cannot appropriately be characterized as normal goods. The items in plaintiff's inventory of work in process are abnormal.[1] The definition of market

---

1. The abnormal items in plaintiff's inventory are to be distinguished from goods described in Reg. 111–1939 Code, § 29.22 (c) (2) as being unsalable at normal prices or unsalable because of damage or imperfections, etc.—the latter are subnormal rather than abnormal goods.

in Reg. (c) 4, therefore, has no application to the unique and exceptional presses manufactured at Canton and Toledo. Plaintiff contends further that the following provision of Reg. (c) 4 is effective to except the presses here involved from its operation:

"Where no open market exists or where quotations are nominal due to stagnant market conditions, the taxpayer must use such evidence of fair market price at the date or dates nearest the inventory as may be available * * *."

It is obvious that there can be no open market for a partially finished press built to specifications of a particular purchaser who is bound by a firm contract to accept and pay a stipulated price for the press when completed and delivered. It is not clear, however, whether an open market exists for all of the basic elements of material, labor and burden of goods in process. Be that as it may, as indicated above the absence of "normal goods" in the inventory of goods in process is sufficient to exclude such goods from the definition of "market" in Reg. (c) 4. Plaintiff may, therefore, "use such evidence of fair market price at the date or dates nearest the inventory as may be available." For upwards of thirty years plaintiff has used available evidence of fair market value by adopting the method outlined above, which is within the upper and lower limits of Statement 6, Chapter 4 of Accounting Research Bulletin No. 43 of the American Institute of Certified Public Accountants. Statement 6 provides:

"As used in the phrase *lower of cost or market* the term *market* means current replacement cost (by purchase or by reproduction, as the case may be) except that:

"(1) Market should not exceed the net realizable value (i. e., estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal); and

"(2) Market should not be less than net realizable value reduced by an allowance for an approximately normal profit margin."

Paragraph 1 of Statement 6 fixes the net realizable value as a ceiling above which market value may not rise. Paragraph 2 of Statement 6 provides a floor below which the market value may not descend. In Montgomery's Auditing, 8th Ed., the method of determining market value under Statement 6 is stated thus:

"To determine market, first compare replacement or reproduction cost and net realizable value * * *. If net realizable value is the lower, that will be market. If replacement or reproduction cost is the lower, that will represent market except that the inventory should not be reduced below the point at which a normal profit may be expected to be realized. 'Normal profit' for this purpose is equivalent to gross profit or gross margin."

Statement 6, however, is not an absolute rule. As stated in the discussion in paragraph 10 of Bulletin 43:

"10. Because of the many variations of circumstances encountered in inventory pricing, Statement 6 is intended as a guide rather than a literal rule. It should be applied realistically in the light of the objectives expressed in this chapter and with due regard to the form, content, and composition of the inventory. The committee considers, for example, that the retail inventory method, if adequate markdowns are currently taken, accomplishes the objectives described herein. * *"

The retail inventory method referred to in Paragraph 10, (Bulletin 43) above is a method which, pursuant to the authority conferred by Reg. 29.22(c)–8, may be adopted by retail merchants. Manifestly, the determination of the replacement costs of the numerous and varied items held for sale in the retail business would be unduly burdensome. To obviate this hardship, the Commissioner has, by the above regulation, authorized retail merchants to value their

inventories at the current retail price at which the goods are offered for sale less a percentage which represents the normal allowance for gross profit. Of course, the retail method of pricing inventories is not applicable here. But there are similarities between the inventory of a retail business with its many categories of items and variety of items within some categories and the inventory of E. W. Bliss' goods in process where each item is significantly and materially different from every other item. It would place an undue burden upon plaintiff to be required to ascertain the replacement cost of each unfinished press in the inventory. Plaintiff contends, therefore, that it is appropriate for it to value its inventory of work in process by ascertaining the value of the work to the enterprise by reference to the sale price reduced by a normal margin of profit.

As shown by the evidence, the rules of the New York Stock Exchange recognize that it is appropriate to value inventory on the basis of sales prices less selling expense and a normal margin of profit. The rules of the Exchange require that applications for listing securities on the Exchange disclose in so far as valuation of inventory is concerned whether "market" is considered as being "(a) replacement value * * * or (b) selling market" and whether in the latter event allowance is made for selling expense and a normal margin of profit. Certified copies of such applications filed by six corporations whose securities are listed on the Exchange were received in evidence. Typical of the disclosures in the applications is the answer of The Warren Pipe & Foundry Company, which reads: " * * * market is considered as selling market less allowance for selling expenses and normal margin of profit." The other five corporations, Haveg Industries, General Tire & Rubber Company, Pullman, Inc., United Shoe Machinery Company, Rotary Electric Steel

Company, submitted more extensive answers stating that the market value of raw materials was determined by replacement costs but in one form or another these companies stated that for goods in process or finished goods "market" was considered either as selling market or net realizable value reduced in either case by an allowance for selling expense and a margin of profit.

The Government argues that the above applications and related evidentiary facts are inadmissible. In support of its position the Government points to the absence of evidence showing—that the corporations in question manufactured custom built products under firm contracts, as does the taxpayer—that any of such corporations produced goods similar to those produced by the taxpayer—whether the corporations applied their selling price formula only to those contracts that were 50% or more complete or on an individual job basis. These and other objections of the Government bear upon the weight rather than upon the admissibility of the evidence. It has been shown that the probative value of such evidence is subject to a substantial discount. But it is wholly unrealistic to suggest the complete absence of the relevancy and materiality of evidence which discloses methods of evaluating inventories that are strikingly similar to the method drawn in question here.[2]

Plaintiff offered evidence tending to show that it is impracticable to determine the replacement or reproduction cost of an incomplete press and adduced further evidence showing that the method of computing the market value of its goods in process inventory relating to presses 50% or more complete was in conformity with generally accepted accounting principles. Contra evidence was offered by the Government on both issues.

Mr. Robert J. Kirk, the partner of Arthur Young & Company who was in charge of auditing plaintiff's accounts in

---

2. The Government's objection to the reception of evidence of discussions with Revenue Agents in re taxpayer's method of

evaluating inventory (Rec. 58–60) is sustained.

1951, testified at length as to the manner of ascertaining the market value of goods in process as outlined above and stated that it was impracticable to ascertain the reproduction or replacement value of the partially finished presses. It was his opinion that the method employed was in accord with generally accepted accounting principles. Mr. Carmen Blough, a distinguished member of the profession of accountancy, testified on behalf of plaintiff. In addition to his wide experience as a certified public accountant and as a partner in Arthur Anderson & Company, one of the five largest firms of certified public accountants in the United States, Mr. Blough served on many of the committees of the American Institute of Certified Public Accountants, including the committee on accounting procedure which issues bulletins for the guidance of accountants and auditors. He was also director of research of the American Institute of Certified Public Accountants for many years prior to his retirement in May 1961. He was the first Chief Accountant of the Securities and Exchange Commission and is also the recipient of awards for outstanding service in the field of accountancy. Mr. Blough expressed his approval of the method adopted by plaintiff in determining the market value of the work in process inventory. It was his opinion that it would be impracticable to determine the cost of reproducing or replacing the partially finished presses in the inventory. He testified that the contrary would be true as to the products of the great majority of the manufacturing corporations in this country which are engaged in mass production of industrial products. As to the latter, Mr. Blough asserted that such companies engage in manufacturing repetitively certain products and would be able through standardized costs to determine reproduction or replacement value of such products when partially completed. He stated in substance, however, that in the case of large custom jobs manufactured in accordance with specifications supplied by the purchaser, it would be difficult and impracticable to ascertain the replacement or reproduction cost of such partially finished products. Mr. Blough recognized that plaintiff's method was not fully in accord with Statement 6. It was his opinion, however, that plaintiff's method was a reasonable one and in full accord with generally accepted accounting principles and that its application produced an acceptable equivalent of market value. Plaintiff also produced as a witness Mr. Newman T. Halvorson, partner in the firm of Ernst & Ernst, which is also one of the eight largest accounting firms in the United States. Mr. Halvorson is a certified public accountant of wide experience, having been associated with his present firm for more than 31 years. Part of his duties is to establish accounting procedures as guide lines for the certified public accountants working for Ernst & Ernst. He has been a member of several committees of the American Institute of Certified Public Accountants, including the Auditing Committee which is regarded as the senior committee. When asked directly how he would arrive at market value of work in process in the case of a manufacturing company such as Bliss, Mr. Halvorson outlined the procedure he would follow, which was the same as that applied by plaintiff. He also testified that the determination of reproduction costs of work in process inventory such as that here involved would not be a useful procedure and it was his opinion that plaintiff's method of valuing inventory conformed to generally accepted principles of accounting. His testimony substantially corroborated the testimony of Kirk and Blough. Edwin J. B. Lewis, Professor of Accounting at Georgetown University, was a witness for the Government. His experience was limited to teaching and working for the Government. He is not a certified public accountant and has not served the apprenticeship necessary to entitle him to take the examination to attain that status. It was Professor Lewis' opinion that plaintiff's method of valuing its inventory of work in process was not in accordance with the best accounting prac-

tices and did not most clearly reflect the taxpayer's income. Professor Norton Bedford also appeared as a witness for the Government. He is a Professor of Accountancy at the University of Illinois and is a certified public accountant. For a brief period he served as secretary of the New Orleans Stock Exchange. He was an auditor for the state of Louisiana for about six months and also served in the Budget Statistical Department of the New Orleans Public Service Company. He was with the accounting firm of Haskins & Sells during one summer. He was offered the coveted George O. May chair of accountancy at Columbia University but was unable to accept the appointment. Neither Professor Bedford or Professor Lewis have had occasion to certify statements of large and publicly owned corporations. Professor Bedford agreed in substantial part with plaintiff's method of computing its inventory of work in process but was of the opinion that unless the expense was too great reproduction costs ought to be ascertained in conformity with the requirement of Statement 6. Professor Bedford's criticism of plaintiff's method of valuing its work in process inventory was purely theoretical. On at least six occasions during his testimony he acknowledged that the method followed by plaintiff was within the scope of generally accepted accounting principles although on one such occasion he expressed the view that net realizable value without any deduction for a normal profit margin would more accurately reflect the income.

■ An evaluation of the evidence outlined above leaves no room for doubt that plaintiff's method of valuing its work in process inventory is in harmony with generally accepted accounting principles and that it is impracticable to compute the replacement or reproduction cost of the partially finished presses here in question. These conclusions are compelled by a comparison of the testimony of the taxpayer's witnesses, all of whom are certified public accountants of wide and extensive experience in auditing accounts of large publicly owned corpora-

tions, with the testimony of the Government's witnesses who are without experience in such matters. Moreover, as shown above, one of the Government's witnesses agreed in large part with the position taken by the taxpayer.

■ It was established also that an inventory valued in accordance with generally accepted accounting principles may be considered as one that conforms "as nearly as may be to the best accounting practice in the trade or business."

A word should be added about the Government's claim originating in the testimony of its witnesses that it would not be impracticable to estimate the cost of reproducing partially finished presses which were more than 50% complete. It is urged that since plaintiff can estimate with substantial accuracy the cost to complete such presses and in order to fix the sale price is required before any work is done to estimate the cost of an entire press that it ought to be able to estimate the cost of reproducing a partially finished press. This argument fails to take into account the many factors that argue persuasively against its acceptance. Mr. Kirk testified that it was only when the work in process is 50% or more complete that it becomes practicable to estimate the cost of completion. The reason for this, as stated by him, is that the earlier stages of manufacture involve the casting, fabrication and machining of parts of the presses. It is in these operations that unpredictable contingencies of spoilages of materials and other excess costs are likely to occur. The assembly of the components of the presses usually accomplished after 50% or more of the total work has been done present no such difficulties. It should be noted also that the value of the work in process less than 50% complete is computed at actual cost. Usually at the latter stage of production it is not practicable to determine whether market value is less than actual cost and plaintiff makes no attempt to make such determination. Mr. Kirk stated that the principal barrier against accurate estimation of the cost of reproduction is lack

of time. He stated frankly that given sufficient time an estimate could be made of the reproduction cost of the work in process. He stated, however, that such an estimate invariably would be less than the "market" as determined by the method employed by plaintiff. The fair inference to be drawn from Kirk's testimony in this regard is that the use of sufficient time by plaintiff's engineers to enable them to estimate the replacement cost of a large number of partially finished presses as of the times nearest the inventory would interfere substantially with the performance of their current duties without producing more accurate results. Furthermore, in any consideration of replacement or reproduction costs of plaintiff's partially finished custom built presses it should be remembered that neither Reg. (c) 4 or any other regulation of the Commissioner requires plaintiff to ascertain the replacement or reproduction cost of such presses.

The Government contends that the taxpayer's method of valuing its inventories does not clearly reflect income because of its improper treatment of selling and administrative expenses. Specifically the Government complains that by reducing its inventory as of December 31, 1951 by an allowance for gross profit of 15% of the sales price of which 12.76% was apportioned to selling and administrative expenses, the taxpayer made a double deduction of such expenses to the extent that selling and administrative expenses allocable to part of the particular contract were already deducted from the income for 1951 as period charges. Illustrating its position, the Government supposes a contract of $10,000, which was 50% complete on December 31, 1951 with selling and administrative expenses applicable to the whole contract of $1276. Presumably one-half of that amount, or $638, was incurred during 1951 and deducted from the income of that year as period charges. "Thus," says the Government, "if the inventory is written down, part of the write-down is attributable to the subtraction from the $10,000 of $1276 for selling and administrative

expenses. However, 50% of this $1276 was presumably deducted elsewhere on the 1951 tax return as a period charge with the result that in revaluing its inventory downward, the taxpayer has, to an extent, double-counted the selling and administrative expenses that were previously deducted elsewhere on the 1951 tax return." The Government's position is unsound. Selling and administrative expenses that were period charges for 1951 played no part whatever in adjusting the inventory downward at the end of that year. The reduction in inventory was accomplished by the allowance of a gross profit of 15% which included 12.76% for selling and administrative expenses covering the whole job. The latter item was separate from and in addition to the selling and administrative expenses entered as a period charge for the year 1951. Both such items, however, reduced the income for 1951,—the period charge by a direct deduction from income—the inventory item of $1276.00 as a part of the 15% allowance for gross profit.

Although the reduction in inventory further increased the loss for 1951, implicit in that procedure were important compensating factors. The market value of the inventory was determined and the inventory valuation at the end of 1951 became the value of the inventory for the beginning of 1952. The reduced value of the inventory in 1952 allowed a sufficient spread between the market value and sale price to permit recoupment at the time of sale of the selling and administrative expense for both 1951 and 1952 which, as indicated above, amounted to 12.76% of the sales price, together with a profit of 2.24%. Thus the loss of income occasioned by the reduction in inventory value was compensated fully by the recoupment of selling and administrative expenses incurred during the life of the contract plus a small net profit.

The Government's most vigorous objection to the taxpayer's method of valuing its inventory is to the latter's allowance of a normal margin of profit. The Government asserts that the allowance of a normal profit in evaluating inven-

tories is not recognized by the American Accountants Association or by the Chartered Accountants of England and Wales. Such an allowance, however, is recognized by the Commissioner of Internal Revenue in Regulation 29.22(C)-8 as being applicable to retail merchants and also has the approval of the American Institute of Certified Public Accountants. It is beyond question that the pronouncements of the last two mentioned authorities on the subject of inventory valuation are entitled to much greater weight than those of the two organizations cited by the Government. The Government also asserts that the late George O. May did not subscribe to the normal profit allowance. It is true that in writing in the Journal of Accountancy for November, 1947, Mr. May, who was a highly respected and influential member of the profession of accountancy, expressed his unwillingness to subscribe to the definition of market value—"as less than the realizable value to the extent of an approximately normal profit margin." As stated by him, "My objection is based partly on principle and partly on the grounds of semantics and expediency." Mr. May's opinions were and are highly regarded by the profession. Yet, in the more than 15 years that have elapsed since he expressed the opinion relied upon by the Government, there has been no change in the American Institute's definition of market value. Of interest in this connection is Mr. May's opinion on the subject of inventory valuation as expressed in his work "Financial Accounting—a Distillation of Experience"—1943—wherein, at page 183, he said, inter alia: "A cost that is not likely to be recovered or even one that will be exactly recovered is scarcely useful. The cost of an article which is intended for sale cannot be said to possess normal usefulness unless it can be expected to produce on sale at least a minimum normal profit. * * * "

In closing its brief, the Government submits the unusual suggestion that if the Court disagrees with the Government's primary position—"that the entire write-down should be disallowed"—

then it ought to adopt the Government's "secondary view" and limit the taxpayer's recovery to an amount that makes no allowance for a gross profit margin. In view of the findings hereinabove made, the Government's suggestion must be rejected. Moreover, the Commissioner is without authority to act retroactively in a particular case where his own regulations are broad enough to allow the taxpayer's method as one in accordance with generally accepted accounting principles or best accounting practices and one which was consistently followed. A question arises whether plaintiff is entitled to apply its usual method of evaluating inventory where the sale price is sufficiently higher than the total of direct and indirect costs of manufacture to protect the taxpayer against actual loss. Paragraph 9 of Bulletin 43, Chapter 4, provides in part:

"In applying the rule, however, judgment must always be exercised and no loss should be recognized unless the evidence indicates clearly that a loss has been sustained."

Dealing with the same subject matter, Section 29.22(c)-4(b) excludes from the definition of "market", "Goods on hand or in process of manufacture for delivery upon firm sales contracts (i.e. those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost." Implicit in plaintiff's argument opposing the application of the quoted terms of Regulation (c) 4 is the view that the regulation applies only in those cases where the terms of the contract of sale specifically provide for protecting a seller against actual loss. Plaintiff cites no authority in support of said contention. The clear and mandatory language of the above regulation would seem to require the application of the principle therein declared whenever the evidence indicates that the sale price will be adequate to cover all direct and indirect costs of manufacture. That such a condition may occur in relatively few

instances is no justification for ignoring the plain terms of the regulation. The parties will, therefore, examine the evidence relative to this matter with a view to reaching an agreement on the contracts affected by the regulation and the amount involved. If the parties are unable to agree the matter may be submitted to the Court.[3]

■ The Government has cited many cases but seems to rely principally on Gunderson Bros. Engineering Corp., 16 T.C. 118 (1951); Ralph Ellstrom, 14 T.C.M. 312 (1955), aff'd. per cur. 235 F.2d 181 (6th Cir. 1956); D. Loveman & Son Export Corp., 34 T.C. 776 (1960), aff'd. 296 F.2d 732 (6th Cir. 1961); Space Electronics, Inc., T.C.M. (1962–54). These cases have been examined. In each, the facts are so materially different that it would be a work of supererogation to further extend this memorandum by reciting the facts and the applicable principles upon which each case was decided. As applied to the case at bar, the cited cases are without precedential value. I hold that the plaintiff has shown by the requisite degree of proof that the Commissioner acted arbitrarily in disallowing the write-down of plaintiff's inventory of work in process. I find further that since 1935 plaintiff has followed the practice of pricing its inventory of goods in process on the basis of cost or market, whichever is lower; that the market value of the goods in process is ascertained by first determining normal or useful costs of the inventory by deducting a gross margin of profit from the sale price and then eliminating from the actual direct cost of the inventory any excess above normal costs.

The above method has been followed consistently since the 1930's and is in substantial accord with the Internal Revenue Regulations and "conforms as nearly as may be to the best accounting practice in the trade or business."

I find further that the inventory was used under the best accounting practice in a balance sheet showing the financial position of the taxpayer and under the general rule applicable in such cases is considered as clearly reflecting taxpayer's income.

For the reasons hereinabove assigned, I hold that plaintiff is entitled to recover on the above claim the sum of $827,134.-94 (consisting of $571,242.00 principal and interest amounting to $255,892.94) with interest from September 2, 1959, less deductions, if any, arising from plaintiff's duty to compute inventory at cost under Regulation 29.22(c)–4(b).[4]

### FRANCHISE TAX REFUNDS— 1942–1943–1944

In October 1944, Ralph S. Marshall, a New York attorney, filed claims on behalf of plaintiff for refunds of New York State franchise taxes for the privilege years commencing November 1, 1930–31 and '34 in the amounts, respectively, of $24,225, $665 and $1164, or an aggregate amount of $26,000. The claims were predicated upon "the view that the average net book value of plaintiff's property more accurately reflected the value of such property than did the assessed values on the basis of which the State Tax Commission had computed the taxes." In February 1945, plaintiff received payment of refunds for 1930, 1931 and 1934 in the sum of $25,964.91, which was approximately the amount claimed by plaintiff. It is plaintiff's position that the refund claims for 1930, 1931 and 1934 were settled as a result of an agreement between Marshall and the State Tax Commission as to the principles governing the pending applications for refunds and claims for franchise tax refunds thereafter to be filed for the years 1942,

---

3. The parties have agreed that by reason of computation of inventories at cost under Regulation 111, § 29.22(c)–4(b), plaintiff's right of recovery is reduced to $777,606.78, with interest from September 2, 1959.

4. In accordance with the agreement of the parties heretofore noted, the amount of plaintiff's right of recovery is reduced to $777,606.78, with interest from September 2, 1959.

1943 and 1944. In support of its position plaintiff relies, to a large extent, upon memoranda of its own office personnel and its attorney Marshall, to which references will hereinafter be made.[5]

In 1945 and 1946 plaintiff filed its application for franchise tax refunds with the State Tax Commission of New York for the years 1942, 1943 and 1944 (base years 1941, 1942 and 1943). It was not until 1951, however, that refunds for those years in the amount of $155,849.76 were received from the State Tax Commission. Included in this amount was a franchise tax refund of $56,564.74, which the Internal Revenue Service added to plaintiff's 1945 tax return as accrued income in that year. This latter refund resulted from a reduction in plaintiff's income for 1943 as fixed by a renegotiation agreement between the taxpayer and the United States. The balance of $98,-295.02 is the amount of the New York State franchise tax refunds for 1942, 1943 and 1944, which plaintiff contends were added improperly to its gross income for 1951. The delay in the payment of refunds for 1942–1944 was due in part to an agreement of November 1946 between Marshall and the State Tax Commission to forebear any action on the claims for such refunds, pending the settlement of litigation between the State Tax Commission and the Internal Revenue Service arising out of the Commission's policy of issuing tax refunds only if such refunds inured to the benefit of the taxpayer. The refund in question grew out of another renegotiation agreement reducing plaintiff's income for 1942 in the amount of $6,300,000. Plaintiff agreed to turn over any franchise tax refund received as a result of said renegotiation agreement to the Government, whereupon the State Tax Commission withheld payment of the refund. Litigation between the United States and the State Tax Commission followed. The litigation was settled in late 1948, yet it was not until almost three years later that the refunds for 1942, 1943 and 1944 were received by plaintiff.

The inter-office memorandum upon which plaintiff relies in support of its position is a communication from Edgar Bilton to E. S. McClary, then secretary and treasurer of plaintiff, dated December 20, 1944, which, inter alia, states:

"Mr. Marshall recently advised us that he had reached an agreement with the Corporation Tax Bureau whereby we would receive a refund of approximately $25,000 for the years 1930, 1931 and 1934.

"*Tax years—1942, 1943 and 1944.*

"No claims for refund have been filed as yet with respect to these years. However, we have been assembling data required for the preparation of such claims. The claim for the tax year 1942 must be filed before February 24, 1945.

"Basically, the issue involved in all years is the valuation of assets within and without the State of New York.

"Fixed asset values within and without New York State were shown in the returns filed on the basis of Federal tax values rather than book values. This is unfavorable to the Company because, on a Federal tax basis, a higher percentage of fixed assets is located in Brooklyn than would be indicated by the use of book values. Furthermore, for the last several years the Corporation Tax Bureau has increased the value of Brooklyn real estate to the local assessed values, thus further increasing the disparity of real estate values. * * * In our refund claim we hope to prove that net book values of fixed assets are a fairer measure of true relative value than either

---

5. Marshall died before the action was filed. Arthur Young & Co. obtained possession of his files which were turned over to the Government at a pre-trial proceeding and retained by the Government for several months. The parties stipulated that Marshall's files were to be considered as files of Bliss and could be offered in evidence as files of the plaintiff kept in the ordinary course of business.

Federal tax values or local assessed values in the case of real estate. It appears that in allowing us refunds for the years 1930–31–34 the Commissioner has agreed to this proposition."

The applications for refunds for 1942, 1943 and 1944 were accompanied by letters of transmittal from Marshall, in which the following appears:

"This is the first of the three tax years discussed with you (Louis C. Hart, Chairman of the Board of Conferees) on January 23, 1945."

"As stated to Mr. Hart on December 12, 1945, the value of assets as claimed have been reworked to reflect the corresponding basic values as used when adjusting the assessments for the tax years, November 1, 1930, 1931 and 1934."

The refunds at issue were based generally on alleged errors in the location, classification and valuation of assets used to determine the percentage of amounts to be apportioned to the State of New York.

 Plaintiff bears the burden of establishing (1) an agreement in 1944 which was to govern the method of computing the amount of franchise tax refund for the years 1942, 1943 and 1944; and (2) the accrual of said refunds in the years 1945 and 1946. Plaintiff contends that the right to recover franchise tax refunds in a reasonably determinable amount was established in 1944 by Mr. Marshall's agreement with Mr. Hart of the State Tax Commission and by the filing of claims for such refunds in 1945 and 1946. In this connection plaintiff says:

"* * * The funds were accruable and should have been accrued no later than the time when the amount of the refunds claimed was computed and the claims were filed."

The circumstances surrounding the computation and payment of the franchise tax refunds for 1930, 1931 and 1934 clearly warrant the inference that the Tax Commission agreed with and applied plaintiff's method of computing the franchise tax returns for those years. The payment by the Commission of an amount only $35.09 less than the $26,000 claimed by plaintiff is almost irrefutable evidence of an agreement between the parties as to the basis upon which refunds for the years then in question should be computed. But there is no credible evidence that such an agreement was also to govern the ascertainment of the amounts of refunds for the years 1942, 1943 and 1944. There is nothing in the inter-office memoranda of December 20, 1944 that spells out an agreement to apply the formula of earlier years to the determination of the refunds claimed for later years. The most that plaintiff can claim for that memorandum is that it expresses the "hope" to be able to prove that the net book values are a fairer measure of relative value than either federal tax values or local assessed values in the case of real estate. The statement by Marshall in one of his transmittal letters that he had "re-worked" the value of assets to "correspond to the basic values used in adjusting assessments for 1930, 1931 and 1934" cannot be considered as reflecting the Tax Commission's agreement to accept and apply such values in computing the refunds for 1942, 1943 and 1944. Indeed none of the statements in the quoted memoranda are binding upon the State Tax Commission. Plaintiff has failed to make out a prima facie case. If by some process of dubious logic it could be held that such a showing were made then, as will hereinafter appear, the countervailing evidence in the record is sufficient to override completely such a determination. As above indicated, plaintiff asserts that the claims for refund ought to have been accrued no later than the time the claims were computed and filed. However, this was not done. Prior to 1951 there was no entry upon any book or financial statement of plaintiff showing the accrual of the 1942, 1943 and 1944 franchise tax claims for refunds. Plaintiff accounts

for the failure to record such accruals as follows:

> "* * * the franchise tax refund claims in relation to location, classification and valuation of assets were handled by Mr. McClary (Secretary and Treasurer of the Company until late 1945 and thereafter for some years Secretary). Mr. McClary was in ill health, and he continued his office in New York after the Company moved its other executive offices elsewhere. As a result of these circumstances the recording of the refunds in the Company's accounts was overlooked and they did not come to the attention of other officers of the Company, or of the independent certified public accountants auditing its accounts, until 1951."

If the refunds did in fact accrue in the years the claims were filed and plaintiff negligently failed to enter the refunds on its records in those years, the Government is now barred by the statute of limitations from taxing the refunds as income in the years of their accrual. Plaintiff's explanation of its failure to record the accruals of the refunds at proper times is not persuasive.

The Court does not question the plaintiff's good faith in advancing the above explanation, but it is unreasonable to suppose that for five or six years the accounting department of a large corporation such as Bliss would be unaware of substantial franchise tax refunds to the corporation's credit. The reasonable view, which is supported by the evidence, is that no refunds for 1942, 1943 or 1944 accrued until 1951, hence no record could or should have been made upon the books of account or financial statements of the corporation before that time. The refund claimed for 1942 was filed on February 7, 1945 in the amount of $45,958.-47. The amount of the refund for that year, as fixed by the Board of Conferees of the Tax Commission in 1951, was $32,-028.67. The disparity between the amount claimed and the amount finally allowed indicates that at the time of filing its 1942 claim and until 1951 plaintiff could not have established its right to recover a tax refund in a reasonably determinable amount for the year 1942. The same argument holds true as to the claim for refund for 1943. The plaintiff filed its claim for that year in the amount of $52,842.41 on January 10, 1946. In 1951 this claim was allowed in the amount of $42,295.22. The 1944 claim for refund does not show the amount claimed on account of errors in location, classification and valuation of assets, hence no comparison between the amount claimed and the amount allowed for that year can be made. However, the unexplained absence of any claim for a specific amount in the application for a refund for 1944 would give rise to the inference that plaintiff was uncertain as to the amount of refund it was entitled to receive. Under these circumstances there could be no accrual of the refund at the time the application therefor was filed.

As indicated above, during the pendency of the litigation between the State of New York and the United States, which was terminated in late 1948, there was no action in relation to the adjustment of plaintiff's claims for refunds for the years in question. On April 27, 1949, after the litigation was terminated, an informal hearing, with Marshall present, was held. Apparently there was no further action on the claims for refunds at issue until 1950. On April 11, 1950 Marshall submitted additional information to the Board of Conferees relating to the value of real estate, machinery and equipment. A conference was held on May 15, 1950. During the year 1950 the depreciation rate of 4% was established and confirmed by the Board of Conferees. On January 15, 1951 another conference was held at which the percentage to compute the tax was discussed. On the same day Marshall wrote Collart, treasurer of plaintiff, advising that "another informal conference was held with the State Tax Commission in Albany" and indicated, among other things, that "reduction in the allocation percentage for each of the three years is reasonably satisfactory." The Tax Commission requested to see

Mr. Marshall during the week of June 18, 1951 "with a view to clearing up the matter." Finally, on July 19, 1951, the Board of Conferees issued its report which, inter alia, contains the following:

"Under the circumstances, this Board feels that the use of the assessed valuation of the taxpayer's real property in Brooklyn is not warranted, and recommends that the values as claimed on the schedules filed with Mr. Marshall's letter of January 10, 1946, be accepted with the following exceptions:

"1. (a) That the value of shares of stock of other corporations owned by the taxpayer be eliminated from the segregation of assets.

"(b) That the value of machinery and equipment be adjusted on a 4% rate of depreciation of the write-down as of December 31, 1932. This change has been agreed to by the taxpayer's representative.

"2. That the unused real estate should not be eliminated from the segregation of assets. This claim has not been pressed by the taxpayer's representative."

The Board recommended that the following assessments be rendered for the tax years beginning November 1, 1942:

(1) A corrected tax of $229,708.25, or a reduction of $32,028.67.

(2) A re-corrected tax for the tax year beginning November 1, 1943 in the amount of $331,-171.08, a reduction of $42,295.-22.

(3) A corrected tax for the tax year beginning November 1, 1944 after renegotiation in the amount of $5,890,035, making a corrected tax of $164,448.60, or a reduction of $84,119.86.

"The total reduction in these taxes is $158,443.75, which amount should be credited or refunded."

The refund of $84,119.86 for 1944 includes items of $2593.99 and $56,564.74 which are not related to the claim for the refund at issue here. For the purposes of this case such unrelated items must be eliminated, thereby reducing the relevant refund for 1944 to the amount of $24,961.13. This amount together with the refunds for 1942 and 1943 total $99,-285.02.

DISCUSSION

It is unnecessary to comment upon the other evidentiary facts in the record which confirm the views hereinabove expressed. Plaintiff has failed to establish the alleged agreement of 1944 upon which its case rests and has likewise failed to establish that any of the claims for refunds at issue here accrued before 1951. Plaintiff cites and relies upon cases that correctly state the law but those cases are inapplicable. Reliance is placed upon the statement in H. O. Boehme, Inc., 15 T.C. 247, 252 (1950) that:

"It is now well established that if at the close of the taxable year an accrual basis taxpayer has all of the basic data or facts from which he may within reasonable limits determine an amount which he has a fixed right to receive, such amount is accruable. Continental Tie & Lumber Co. v. United States, 286 U.S. 290 [52 S.Ct. 529, 76 L.Ed. 1111]; United States v. Anderson, 269 U.S. 422 [46 S.Ct. 131, 70 L.Ed. 347]; Security Flour Mills Co. v. Commissioner, supra, [321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725]; Uncasville Mfg. Co. v. Commissioner [2 Cir.], 55 Fed. (2d) 893; ACF-Brill Motors Co., 4 T.C. 263."

It is clear from the evidence in this case that before 1951 plaintiff did not have "all the basic data or facts" upon which to determine with reasonable accuracy the amounts of refunds it was entitled to receive during each of the three years in question. In Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 297, 298, 52 S.Ct. 529, 76 L. Ed. 1111, the question was whether an award under Section 204 of the Trans-

portation Act which was paid in 1923 ought to have been assessed in 1920. In answering the question in the affirmative, the court said, inter alia:

"Obviously the data had to be obtained from the railway's books and accounts and from entries therein all made prior to March 1, 1920. These accounts contained all the information that could ever be available touching relevant expenditures. Compare United States v. Anderson, 269 U.S. 422 [46 S.Ct. 131, 70 L.Ed. 347]. The petitioner was promptly informed by the terms of § 209, as supplemented by the instructions issued by the Commission, of the method to be followed in allocating charges to operation during periods under inquiry. It does not appear that a proper effort would not have obtained a result approximately in accord with what the Commission ultimately found."

It is unnecessary to labor the point that in the years 1945 and 1946 "a proper effort" on plaintiff's part would not have produced claims "approximately in accord" with the ultimate determinations of the Board of Conferees. Plaintiff also relies on Food Machinery & Chemical Corp. v. United States, Ct.Cl., 286 F.2d 177. The essential facts in that case are aptly summarized by plaintiff as follows:

"Plaintiff sued to recover alleged overpayment of income tax by reason of a determination of the Commissioner that a war contract termination claim, allowed in 1946 and paid in 1946 and 1947, constituted accrued income in 1945. The question presented was whether the plaintiff had in 1945 a fixed right to receive a reasonably ascertainable amount."

The evidence in the last cited case established beyond dispute an agreement in 1945 between the taxpayer and a Captain Rosenthal of the Navy, representing the Bureau of Ships, as to the profit percentage to be applied to plaintiff's termination claim. The statute provided that the agreement was to be approved by the Settlement Board. The approval was not obtained until March 27, 1946. The Court of Claims held, however, that the profit allowance accrued in 1945, stating:

"The substance of the settlement proposal was to be and in this case had been worked out between the contractor and the Government's contracting officer. Their agreement, reached with no visible discord, and giving rise to no apparent question as to over-all reasonableness, established plaintiff's right in a reasonably ascertainable amount."

In the case at bar there was no agreement as to the method of computing refunds for the years in question before the matter was determined by the Board of Conferees in 1951. All of the cases cited by plaintiff are distinguishable on their facts. Until the action of the Board of Conferees in this case there remained unsettled and open for negotiation or decision the following:

1. The standard of proof required in fixing the value of plaintiff's New York real estate.

2. The question whether unused real estate would be included in the segregation of assets.

3. The question whether the value of shares of stock of other corporations should be eliminated from the segregation of assets.

4. Whether the rate of depreciation on machinery and equipment should be reduced from 8% to 4%.

Until definite answers were given to the foregoing questions the amount of the claimed refunds could not be fixed with reasonable certainty.

For the reasons stated above, plaintiff's claim for recovery of franchise tax refunds for years 1942–1943–1944 is denied.

An order may be made in accordance with the foregoing.