**F I L E D**
United States Court of Appeals
Tenth Circuit

MAY 8 2001

**PATRICK FISHER**
Clerk

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CONSOLIDATED
MANUFACTURING, INC.; M.P.
LONG LIVING TRUST; MERL
PHILIP LONG, Trustee, Tax Matters
Person,

     Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

     Respondent-Appellee.

No. 98-9027

---

**Appeal from the United States Tax Court**
**(T.C. No. 6176-96)**

---

Eric S. Namee (James Scott MacBeth with him on the briefs), of Hinkle Elkouri
Law Firm, Wichita, Kansas, for Petitioners-Appellants.

Charles Bricken (Jonathan S. Cohen with him on the brief), Attorneys, Tax
Division, Department of Justice, Washington, D.C., for Respondent-Appellee.

---

Before **TACHA**, Chief Judge, **SEYMOUR** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This case involves financial accounting issues in the context of income taxation. Consolidated Manufacturing purchases used car parts, called "cores," rebuilds the cores with new components, and then sells them. Consolidated uses a pricing system that encourages its customers for the rebuilt products to send a replacement core back to it. In this way, Consolidated ensures a continuous supply of its primary raw material – the cores. The price that the company agrees to pay its customers for such replacement cores is called the "core amount" (referred to herein as "core amount" or "customer core amount"). For tax purposes, Consolidated uses the first-in, first-out (FIFO) accounting method for its inventory of these cores, but it uses the last-in, first-out (LIFO) method for its other inventory expenses – labor, overhead, and new parts. Cores in inventory that have already been integrated into a finished rebuilt part are valued by the company at the price the company would pay to purchase such a core from a professional core supplier. All other cores in inventory, either in raw inventory or integrated into partly finished products, are valued at scrap metal prices.

After auditing the company's tax returns, the Commissioner of Internal Revenue determined that several of these accounting procedures were improper. The Commissioner ruled that the company must use the FIFO method for all of its expenses, and that the inventory of cores should be valued at the customer core amounts rather than as scrap metal or at supplier core prices. Consolidated

challenged these determinations, and the tax court affirmed the Commissioner's decisions. We hold that (1) the Commissioner correctly determined that Consolidated's mixed use of LIFO and FIFO was improper; (2) it was not an abuse of discretion for the Commissioner to order Consolidated to use FIFO for all inventory, rather than LIFO; and (3) the customer core amounts reflect the cost, but not the market price, of the inventory of cores. Because Consolidated chose to use the lower of cost or market price to value its inventory of cores, we remand for further findings on the market prices of the cores. We therefore AFFIRM in part, REVERSE in part, and REMAND.

## BACKGROUND

I. <u>Customer Cores</u>

Consolidated remanufactures used car parts. The company acquires worn parts, strips them down to a reusable "core," and then rebuilds them with new components. These rebuilt parts are sold to its customers, Ford dealers.

The used core is the key ingredient in the remanufacturing process. Although Consolidated buys some of its cores from professional core suppliers, it acquires most from its customers. The company uses its pricing method to ensure that it has a constant supply of cores from its customers. When it sells a remanufactured part, Consolidated charges both an "exchange amount" and a

"core amount." These "exchange" and "core" amounts are used in Consolidated's price lists, invoices, and financial accounting books. The customer core amount is credited back if the customer sends a core of similar type to Consolidated for the rebuilt core that it has purchased from Consolidated. This method of obtaining used cores primarily from customers for the rebuilt parts is a standard practice in the industry.

Consolidated accepts these returned cores on the basis of a visual inspection by the pick-up driver. Even if the core later turns out to be unusable, the customer is credited for the full customer core amount. The company also sometimes accepts cores with missing parts or other defects, but at less than full credit. Consolidated's invoices provide that to receive credit a core has to be returned within a given time period, such as sixty days, but in practice the company accepts cores even after these deadlines, and even if the core has become obsolete. Gregory Gordon, the president of Consolidated, testified that the company sometimes accepts a core that does not match the type delivered to the customer, although in that case the company does not refund the full customer core amount, but rather pays the customer the price that a professional core supplier would charge for such a core. This price is usually much less than the customer core amount, which is purposely set high by Consolidated to induce customers to return their used parts.

During 1990 and 1991, approximately 77% to 97% of sales (depending on the type of part) resulted in the customer's providing a core back to Consolidated. Of the consumer cores that Consolidated accepted, about 18% to 37% had defects and were not rebuildable. Unusable cores are sold as scrap metal.

Gordon testified that Consolidated uses this method of obtaining cores because it enables the company to acquire customer cores at "virtually no cost." The delivery trucks are returning to Consolidated anyway, so the return loads with customer cores are freight-free.

Consolidated sets the price for the customer core amount on the basis of several factors, including the supply of cores in the used-parts market and the demand for the rebuilt part. Gordon testified that the company considers the current inventory levels of the type of core involved in the transaction and the cost of purchasing that type of core from a core supplier. To induce the customer to return a core, the core amount reflects an amount above the price that a professional core supplier would charge.

II. Supplier Cores

Consolidated buys some of its used cores from third-party core suppliers, businesses that specialize in supplying cores to meet specific needs. Jimmy Bishop, president of Consolidated's largest supplier, testified that suppliers buy

used parts from salvage yards, car manufacturers, or consumers on the basis of a price schedule that they set. The suppliers inspect these cores and then sell them to remanufacturers like Consolidated at somewhat higher prices than they pay to buy them, but for less than the customer core amount that Consolidated is willing to credit its customers when they return cores in conjunction with the purchase of rebuilt parts.

Unlike customer cores, supplier cores are guaranteed to be usable. If Consolidated discovers a defect in a supplier core during the rebuilding process, that core can be returned to the supplier for credit. Because supplier cores are ordered to meet specific needs, they generally remain in Consolidated's inventory for a brief period of time. Consolidated's inventory, therefore, consists almost entirely of customer cores.

III. Consolidated's Accounting Practices

Manufacturing businesses must take inventory each year for tax purposes. See I.R.C. § 471. Through its choice of an accounting method for inventory, a taxpayer can manipulate its reported income and therefore its tax burden. Consequently, the tax code requires that the method both "conform[] as nearly as may be to the best accounting practices" and "clearly reflect[] the income." Id. Here, Consolidated could change accounting methods only with the consent of the Commissioner. See I.R.C. § 446(e).

One of two assumptions about the flow of goods is commonly made in calculating inventory: first-in, first-out (FIFO) or last-in, first-out (LIFO). These assumptions do not track the physical movement of actual goods, but rather are used to simplify the calculations. Under the FIFO method, the taxpayer assumes that any goods sold were the oldest in stock, so the goods remaining in inventory are the most recently procured or produced. Under the LIFO method, the reverse is assumed: The most recently procured or produced goods were sold first, and the inventory consists of the oldest remaining goods. FIFO is the default rule for tax purposes, but under some circumstances a company may opt to use the LIFO method instead. See Treas. Reg. § 1.471-2(d).

Since 1980, Consolidated has used the LIFO method for its labor, overhead costs, and new parts inventories. However, the company continues to use the FIFO method for its inventory of cores. It also uses the "component of cost" method: Rather than assigning a value to each item in its inventory, Consolidated totals the units of each raw material, labor, overhead, and other costs represented by its inventory. Thus, the cost of a finished product is calculated as the sum of its materials and other costs of production.

Items inventoried under LIFO must be valued at cost, see I.R.C. § 472(b)(2), but Consolidated has elected to value its used cores inventoried under FIFO at the lower of cost or market price as permitted by Treas. Reg. § 1-

471-2(c). For tax and insurance purposes, it values the cores in its remanufactured finished products at the price that a core supplier would charge for that core, rather than at the customer core amount. The company values its inventory of cores that either have not yet been integrated into a remanufactured part or have been only partly integrated into a work in process at scrap metal prices. However, the tax court found that for its financial reports, Consolidated values its entire inventory of customer cores at supplier core prices.

IV. Administrative and Judicial Proceedings

The Commissioner audited Consolidated's returns for 1990 and 1991 and determined that the returns understated Consolidated's income for those two years by nearly $3.75 million. There were two bases for this adjustment: First, the company had used an unallowable method to value its inventory by valuing cores at less than the customer core amount. Second, the company's election of the LIFO method was invalid because it applies only to the inventory of overhead, labor, and new parts, but not to the inventory of cores. Because the Commissioner concluded that Consolidated had improperly elected the LIFO method for inventory, the Commissioner terminated its use of that method, forcing Consolidated to use FIFO instead for all inventory. Consolidated sought review in the Tax Court, which ruled for the Commissioner on all issues.

**DISCUSSION**

Consolidated raises three issues. First, it argues that it should be allowed to use the LIFO method to calculate its costs for labor, overhead, and some raw materials, without using it for the used cores. Second, it argues that even if it may not use LIFO in this manner, it was an abuse of the Commissioner's discretion to order Consolidated to use FIFO for everything. Third, it argues that the Commissioner overvalued its inventory of customer cores by using customer core amounts rather than supplier core amounts or scrap metal prices.

I. Jurisdiction and Standard of Review

We have jurisdiction to review decisions of the Tax Court under I.R.C. § 7482(a)(1), which provides that the review shall be "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." Thus, we review factual questions for clear error, legal questions de novo, and mixed questions of law and fact either for clear error or de novo, depending on whether the question is primarily factual or legal. Anderson v. Comm'r, 62 F.3d 1266, 1270 (10th Cir. 1995). We review de novo findings of "ultimate fact derived from applying legal principles to subsidiary facts." First Nat'l Bank v. Comm'r, 921 F.2d 1081, 1086 (10th Cir. 1990). Finally, we review the Commissioner's determination that an accounting method does not clearly reflect

income for abuse of discretion.  Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 532 (1979).

II.  Use of the LIFO Method for Overhead, Labor, and New Parts

A taxpayer may elect to use the LIFO method to inventory specified "goods . . . properly subject to inventory."  Treas. Reg. § 1.472-1(a); see also I.R.C. § 472(a).  Regulations further provide that the taxpayer may limit its use of LIFO to one or more of the raw materials in a class of goods.  Treas. Reg. § 1.472-1(c), (j).  In that case, the taxpayer uses FIFO for all remaining costs.  Thus, Consolidated presumably could have invoked this provision to use LIFO for its inventory of new parts (a raw material), for example, and FIFO for labor, overhead, and used engine cores.

Consolidated, however, elected to use LIFO for its labor, overhead, and new parts.  Consolidated does not contend that labor and overhead are "raw materials," so the regulatory exception in § 1.472.1(c), (j) does not apply to this case.  The question, therefore, is whether labor, overhead, and the new parts alone constitute "goods . . . properly subject to inventory."  We hold they are not.

In the manufacturing context, goods subject to inventory are tangible, movable objects.  Cf. Jim Turin & Sons, Inc. v. Comm'r, 219 F.3d 1103, 1107 (9th Cir. 2000) (holding that term "merchandise" in § 1.471-1, defining when inventories must be taken for tax purposes, does not include items that "cannot be

- 10 -

warehoused in inventory"). This accords with the plain meaning of the term "goods." See Black's Law Dictionary 694 (6th ed. 1990); Webster's Third New International Dictionary 978 (1986). Thus, under § 1.472-1(a) a manufacturer may elect LIFO only with respect to tangible objects.

In this case, Consolidated produces "goods" – i.e., rebuilt engines. Rebuilt engines are made of cores, new parts, labor, and overhead. Labor and overhead are not themselves "goods," because they are not tangible objects. Even when the new parts are factored in, there is no tangible product; the labor and overhead is applied to the cores together with the new parts. It was therefore improper for Consolidated to use LIFO to inventory these components without also including the cores.

Consolidated had three options under the regulations: (1) It could use FIFO for everything; (2) it could use LIFO for everything; or (3) it could use LIFO for some or all of its raw materials (new parts or cores) and FIFO for the other raw materials, labor, and overhead. Consolidated chose a fourth, impermissible option: using FIFO for some raw materials (cores) and LIFO for the other raw material (new parts), as well as for labor and overhead. Although option (3) is permitted by the regulations, Consolidated's fourth option is not.

Consolidated argues that our understanding of the term "goods" is contradicted by the regulations under I.R.C. § 471 that govern the FIFO method.

We disagree. It is true that the regulations pertaining to § 471 also refer to inventorying "goods." See Treas. Reg. § 1.471-2(d). Consolidated is required to include all direct and indirect costs in its inventory, Treas. Reg. § 1.471-11(a), and if Consolidated were to inventory its raw materials using LIFO, then it would inventory only its labor and overhead using FIFO. However, the provision that refers to "goods" also explicitly references the regulations under § 472 that govern the LIFO method. See Treas. Reg. § 1.471-2(d). These regulations, not those under § 471, cover Consolidated's hypothetical situation. It is clear from the examples in § 1.472-1(c) that when a company uses LIFO for its raw materials, it uses FIFO for its labor and overhead. Thus, even though labor and overhead are not goods, § 1.472-1(c) requires a taxpayer to use FIFO for them in some circumstances – but not circumstances applicable to Consolidated.

Consolidated also contends that we should allow "flexibility" in the LIFO regulations because Congress intended that all taxpayers have the option to use LIFO. Our decision does not foreclose the use of LIFO by anyone if it is properly elected. Consolidated could have elected to use LIFO to value its inventories of used engine cores and new parts and its labor and overhead costs. Rather, our decision prevents a taxpayer from mixing methods in a way that is not authorized by the tax code or treasury regulations.

We find Consolidated's reliance on Hutzler Brothers Co. v. Commissioner, 8 T.C. 14 (1947), to be misplaced. In that case, the tax court allowed a department store to use the dollar value of its merchandise in taking inventory under LIFO, rather than making the company track the physical movement of each item. Id. at 31. The court found that Congress intended that LIFO be available to all, and that department-store accounting methods made it impractical to compute inventory by tracking specific articles. Id. at 29-30. It therefore held that the store must be allowed to use the dollar-value method. (The tax regulations have since been amended specifically to permit the dollar-value method. See Treas. Reg. § 1.472-8.)

In this case, by contrast, Consolidated has not shown that it would have been impossible for the company to use LIFO for its entire inventory. Thus, even if we were inclined to adopt the dicta in Hutzler Brothers that LIFO must be made available to all taxpayers, it would not avail Consolidated.

In sum, we hold that Consolidated's election to use LIFO just for its labor, overhead, and new parts inventory was improper.

III.  Termination of LIFO

The Commissioner has substantial discretion to terminate Consolidated's LIFO election and order the company to use FIFO instead. The tax code specifically provides that "if the [accounting] method used does not clearly reflect

- 13 -

income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." I.R.C. § 446(b). The regulations state more specifically that "whether or not [the LIFO method], once adopted, may be continued, and the propriety of all computations incidental to the use of such method, will be determined by the Commissioner in connection with the examination of the taxpayer's income tax returns." Treas. Reg. § 1.472-3(d).

To the extent that the regulations constrain this discretion, they do so in a way that supports the Commissioner's decision. They provide that

> if the taxpayer is required by the Commissioner to discontinue the use of the LIFO method by reason of the taxpayer's failure to conform to the requirements detailed in § 1.472-2 [governing election and use of LIFO], the inventory of the specified goods for the first taxable year affected by the change and for each taxable year thereafter shall be taken . . . [i]n conformity with the method used by the taxpayer under § 471 in inventorying goods not included in his LIFO inventory computations.

Treas. Reg. § 1.472-6. Consolidated's LIFO election was improper because it did not comply with § 1.472-2. It was not an abuse of the Commissioner's discretion to order Consolidated to switch to FIFO, which is the method called for by § 471 to inventory used cores.

Mamula v. Commissioner, 346 F.2d 1016 (9th Cir. 1965), is not to the contrary. In that case, the Ninth Circuit held that a taxpayer who, in good faith, had chosen an improper accounting method for one year could not be required to

- 14 -

use the least advantageous permissible method when recalculating that year's taxes. Id. at 1019. Mamula, however, involves completely different accounting issues. That case does not address the propriety of the Commissioner's requiring a taxpayer to use FIFO accounting for inventory when the taxpayer previously had used the LIFO method incorrectly. Thus, Mamula is simply inapposite. We note also that Mamula involved a mistake that was caught in the first year it was used; here, on the other hand, Consolidated used the impermissible method for more than a decade before being caught. Cf. Cargill, Inc. v. United States, 91 F. Supp. 2d 1293, 1299 (D. Minn. 2000) (distinguishing Mamula as a "narrow exception" involving a situation in which the Commissioner "disallowed the taxpayer's chosen method of accounting shortly after the taxpayer began using it").

In sum, we hold that once the Commissioner determined that Consolidated had not properly elected to use the LIFO method, it was not an abuse of discretion to order the company to use FIFO instead.

IV.  Value of Used Cores

As permitted by the FIFO regulations, Treas. Reg. § 1.471-2(c), Consolidated values its inventory of used cores at the lower of cost or market. Consolidated reported those cores that were not part of a finished product at scrap value for tax purposes. Consolidated now concedes that this does not clearly reflect income. The Commissioner determined that the used cores should instead

- 15 -

be valued at the customer core amounts listed on the sales invoices. The tax court upheld this determination, finding that the customer core amount properly reflects both cost and market price, and therefore is the lower of cost or market.

There is sufficient evidence to support the tax court's finding that the cost of a customer core is the customer core amount. Cost is generally defined in terms of the invoice price. See Treas. Reg. § 1.471-3(b). In this case, the invoices referred to the customer core amount as the "price." The tax court's finding on this matter was not clearly erroneous.

We are not persuaded, however, by the tax court's finding that the customer core amount also reflects the market price of the used core. Rather, we conclude the Commissioner's method does not "clearly reflect income" as required by I.R.C. § 446(b). Even if a taxpayer's method does not clearly reflect income, the Commissioner may not substitute a different method that also does not clearly reflect income. Harden v. Comm'r, 223 F.2d 418, 421 (10th Cir. 1955). Because we find clear error, we remand to the tax court.

The market price is "the aggregate of the current bid prices prevailing at the date of the inventory." Treas. Reg. § 1.471-4(a)(1). "The courts have uniformly interpreted 'bid price' to mean replacement cost, that is, the price the taxpayer would have to pay on the open market to purchase or reproduce the inventory items." Thor Power Tool Co. v. Comm'r, 439 U.S. 522, 534 (1979).

This open market must be one in which the taxpayer can participate. D. Loveman & Son Export Corp. v. Comm'r, 34 T.C. 776, 799 (1960), aff'd, 296 F.2d 732 (6th Cir. 1961). The determination of market price must be made on the basis of the taxpayer's usual volume of transaction. Treas. Reg. § 1.471-4(a).

To acquire used cores, Consolidated participates in two markets: one with its customers, and one with professional core suppliers. Only the second of these markets, however, is "open" as that term is generally understood. The Thor Power Tool Court did not define the term "open market," but its plain meaning is "a freely competitive market in which any buyer or seller may trade and in which prices are determined by competition." Webster's Third New International Dictionary 1580 (1986); cf. Freeman v. Laventhol & Horwath, 915 F.2d 193, 198 (6th Cir. 1990) (defining "open market" in the securities context as "one in which anyone, or at least a large number of persons, can buy or sell"); E.W. Bliss Co. v. United States, 224 F. Supp. 374, 379 (N.D. Ohio 1963) (stating in the tax context that it is "obvious" there is no open market for partly finished, custom-ordered products that have firm sales contracts), aff'd, 351 F.2d 449 (6th Cir. 1965). Consolidated's customer market for cores is not open, because (1) Consolidated is the only purchaser in that market; and (2) the customer must buy a remanufactured part from Consolidated before Consolidated will buy back a used core of the same type – indeed, as noted above, when Consolidated purchased

- 17 -

cores of a different type from its consumers, it did not use the customer core amounts. The tax court erred in finding this to be an open market.

The supplier core market, by contrast, is open. Multiple suppliers compete to sell used cores to the many remanufacturers of car parts. The market price of a used core, its replacement cost, should be determined by looking to the price that Consolidated would have to pay a professional supplier, not the price that it would pay to a customer.

We recognize that the supplier market contains some features that distinguish it from the customer market from which Consolidated obtained most of its inventory of cores. For example, the suppliers guarantee that their cores are usable, whereas the customers do not; and Consolidated does not pay freight costs for the customer cores, while the record is not clear whether it does so for supplier cores. We believe, however, that the tax court will be able to factor these differences out of the supplier prices in a reasonably accurate manner. For example, if 16% of customer-provided engine cores have defects that prevent them from being rebuilt, then the court could reduce the price of supplier cores by 16% to reflect the value of the suppliers' guarantee that their cores will be usable (which guarantee does not apply to the vast majority of Consolidated's cores since they are obtained from customers without guarantees).

Consolidated relies heavily on Burrell v. Commissioner, 400 F.2d 682 (10th Cir. 1968). That case held that the core amount charged for a rebuilt engine part had to be accrued by the remanufacturer if no customer core was returned within the stated period. See id. at 685. We also noted, in presenting the factual background, that the core amount "was purposely made higher than the value of the old core to be returned." Id. at 683. That statement is not a holding, and in fact is not even dictum because it is merely a recitation of the factual record in that particular case. It is therefore of little relevance here. On the record in this case, we cannot say how the true market price for used cores compares to the customer core amount after various cost adjustments are considered. We leave it to the tax court to make this determination on remand.

The Commissioner argues that because Consolidated acquires the majority of its used cores from its customers, the market dynamics would be very different if it acquired them all from professional suppliers. Therefore, the Commissioner concludes, it would be inappropriate to use current supplier prices as the basis for market value. We believe that this is pure speculation. If customers could not sell their used cores directly to Consolidated, there would be more cores available to professional suppliers. Thus, both the supply and demand of supplier cores would increase, and it is not clear how price would be affected. In the absence of more concrete data, we find that the supplier market (once the value of the

- 19 -

supplier guarantee is factored out and any differences in transportation costs are taken into account) is the appropriate measure.

Consolidated, on the other hand, urges us to find that the proper market is the one between professional core suppliers and the salvage yards from which they acquire parts. There is no evidence, however, that Consolidated actually participates in this market, or even that it could realistically do so in the volume that the remanufacturing process requires. It would therefore be inappropriate to use salvage yard prices as Consolidated's replacement costs. See, e.g., S. Weisbart & Co. v. Comm'r, 23 T.C.M. (CCH) 788, 801 (1964) (using an average of the bid prices on the open markets that reflected the taxpayer's actual purchases, weighted by volume of the taxpayer's purchases in each market); D. Loveman & Son Export Corp., 34 T.C. at 799.

In sum, we uphold the tax court's determination that the customer core amount is the cost of a used core, but reverse its finding that the customer core amount also represented the market price.

**CONCLUSION**

We AFFIRM the tax court's rulings that (1) Consolidated's use of LIFO was improper, (2) the Commissioner was entitled to end Consolidated's use of LIFO and to require that Consolidated use the FIFO method of valuing inventory, and (3) the customer core amount represents the cost of a used customer core. We REVERSE its finding that the customer core amount is the market price of a used core because we find that the proper market is the professional supplier market (as adjusted for the differences between supplier and customer cores reflected in the lack of a guarantee and transportation cost differences for customer cores), and we REMAND this case to the tax court for further proceedings on the market price.