# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-3730 & 05-3742

JPMORGAN CHASE & CO., successor in interest to
Bank One Corporation, successor in interest to
First Chicago NBD Corporation, formerly NBD
Bankcorp, Inc., successor in interest to First Chicago
Corporation, and affiliated corporations,

*Petitioner-Appellant*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

———————

Appeals from the United States Tax Court.
Nos. 5759-95 and 5956-97—**David Laro**, *Judge*.

———————

ARGUED MARCH 30, 2006—DECIDED AUGUST 9, 2006

———————

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges*.

MANION, *Circuit Judge*. JPMorgan Chase & Company ("the taxpayer"), as successor and on behalf of its affiliated corporation First National Bank of Chicago, contests alleged income tax deficiencies assessed for the years 1990-1993. Specifically, the taxpayer and the Commissioner of the

Internal Revenue Service ("Commissioner") disagree about how to calculate the fair market value, and thus the proper taxation, of transactions known as "interest swaps." The tax court rejected the accounting methods used by both the taxpayer and the Commissioner to value the interest swaps, crafted a different method based upon expert testimony, and ordered the parties to provide computations of the taxes due based on the court's findings. Making the computations was apparently a complicated process. More than a year after the tax court issued its opinion, both parties submitted new computations and briefing to the court. The court then adopted the Commissioner's computations in their entirety. The taxpayer appeals. We affirm in part, vacate in part, and remand for further proceedings.

**I.**

On January 19, 1995, the Commissioner issued a notice of deficiency to the taxpayer for the 1990 taxable year totaling $1,661,112, and for the 1991 taxable year totaling $2,956,794. The Commissioner followed up with another notice of deficiency for the 1993 taxable year in the amount of $95,156,499. Although the Commissioner did not assess a deficiency for 1992, the 1993 deficiency placed in issue adjustments taken in 1992. The taxpayer objected to the deficiency notices and petitioned the tax court for relief, raising over 40 objections. Mercifully, the parties settled all but one dispute. The remaining issue involves the taxation of income derived from "interest swaps."

The tax court's 160-page opinion in this case provides a veritable treatise on interest swaps, so we refrain from duplicating the intricacies of such transactions here. *See Bank One Corp. v. Comm'r*, 120 T.C. 174, 185-208 (2003).

Essentially, in an interest swap, two "counter-parties" agree to make periodic interest payments to each other on a set principal amount, the "notional amount," for a specific term. The notional amount is used only to calculate the interest; there is no underlying loan and neither party ever pays the principal. Usually, one party pays interest at a fixed rate, the other at a variable or floating rate based on a particular interest rate index, such as the London Interbank Offering Rate (LIBOR). A party may profit from such a transaction by correctly predicting the fluctuations in the interest rate and swapping accordingly. For example, if the floating rate rises above the fixed rate during the payment term, the counter-party paying the fixed rate (and thus receiving the floating rate), would reap a profit. Thus, the interest swaps are subject to investment risks from changes in interest rates, as well as the risk that the other counter-party will fail to pay its obligation. Counter-parties manage these risks by entering into numerous swaps on both the floating and fixed sides, and by entering multiple transactions with the same counter-party on the opposite fixed or floating side, thereby avoiding a net loss in the event of that counter-party's default.

Since a counter-party may reap a profit or a loss from interest swaps, the party must, as with its other investments, record at the end of the taxable year any gain or loss from the transaction. How to calculate the gain or loss is at issue in this case. For tax purposes during the contested years, the taxpayer valued its swap portfolio annually on a date slightly before the end of the tax and calendar year, typically on the 20th day of December. Using the early closing date, the taxpayer calculated the interest swap values by running a computer program common in the industry called the Devon Derivatives Software System ("Devon system"). This system uses a mathematical model incorporating the

bid and ask prices of swaps and the forecasted future interest rates to compute a "midmarket" value for the swaps. The midmarket value is the net present value of the future cash flows generated by the swap. The Devon system assumes that both counter-parties have the same AA credit rating. For tax purposes, in order to report the income derived from swaps, the taxpayer valued the swaps at their midmarket values, but then deferred a portion of the income to account for credit risks with less-worthy counter-parties and for the taxpayer's own administrative costs necessary to maintain the swaps.

The Commissioner agreed with the principle of adjustments for credit risk and administrative costs, but not with the taxpayer's method of deferring income to account for those adjustments. Before the tax court, the taxpayer recharacterized its deferrals as adjustments in valuation that were necessary to clearly reflect the fair market value of the interest swaps. Regardless of the characterization as a deferral or an adjustment, the Commissioner argued that the taxpayer's particular method of accounting for credit risk and administrative costs did not produce a fair market value of the swaps that clearly reflected income. The Commissioner proposed that, under the circumstances in this case, the best method for producing a fair market value that clearly reflected income was to use the unadjusted midmarket values produced by the Devon system. This was the value reported by the taxpayer on its return before the income deferrals were taken.

The tax court thus confronted a controversy over the proper calculation of the fair market value of interest swaps to report as income. Presented with this novel issue, the tax court appointed its own two experts, in addition to the five experts submitted by the parties. In total, the trial involved the testimony of twenty-one factual witnesses, seven expert

witnesses, and over 10,000 pages of exhibits. After review-
ing the trial record and the parties' 3,300 pages of additional
briefing and proposed findings, the tax court rejected both
the taxpayer's and the Commissioner's method, concluding
that both methods failed to reflect income clearly. Based
primarily on its own experts, the tax court crafted its own
method for determining the fair market value of interest
swaps and ordered the parties to provide calculations in
accordance with its method. The court-approved method
required a nuanced valuation of each swap that accounted
for, among other criteria, changes in the counter-parties'
credit ratings, changes in the interest rates over time, and
netting agreements that protected counter-parties in the
event of a default.

After over a year-and-a-half of wrestling with the num-
bers and the tax court's criteria, the parties sub-
mitted computations. Due to the limitations of the record
and the complexity of the transactions, the parties were
unable to comply with all of the tax court's requirements for
the computations. For example, the parties were unable to
reconstruct or calculate the value of the swaps as of Decem-
ber 31 of each tax year due to the taxpayer's use of an earlier
closing date. The parties then presented another deluge of
briefing and calculations to the tax court. In sharp contrast
to its thorough, painstaking opinion on the accounting
methodology issued on May 2, 2003, the tax court, in a
cursory order entered on June 17, 2005, adopted the Com-
missioner's computations without discussion of disputed
issues and decided that the taxpayer owed over seven
million dollars in income tax. The taxpayer appeals both the
accounting methodology decision and the tax court's
adoption of the Commissioner's computations.

Meanwhile, the Commissioner independently issued a
notice of proposed rulemaking that would affect the

valuation of interest swaps. *See* Safe Harbor for Valuation Under Section 475, 70 Fed. Reg. 29663 (May 24, 2005). The proposed rule sets forth a safe harbor for valuing securities such as interest swaps. Specifically, the proposed rule provides that if the valuation reported on certain financial statements mirrors the reported taxable value, then the Commissioner will accept the value as fair market value. Such a rule, if finalized, would likely bear on similar cases and may limit this case's precedential value. More timely rulemaking might have prevented or at least facilitated resolution of this present dispute. Regardless, because this case involves tax years preceding the proposed rule, we proceed to the merits.

## II.

On appeal, the taxpayer argues that the tax court erred in rejecting its methodology for accounting for income from the interest swaps. In addressing methods of accounting used for tax purposes, the Internal Revenue Code ("Code") provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." 26 U.S.C. § 446(a). The Code then offers an exception: "[i]f no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, then the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." 26 U.S.C. § 446(b).

Tax regulations further instruct that if, as here, a taxpayer uses the accrual method, "[a]pplicable provisions of the Code, the Income Tax Regulations, and other guidance published by the Secretary prescribe the manner in which a liability that has been incurred is taken into account . . . ." 26

C.F.R. § 1.446-1(c)(ii). In this case, the taxpayer incurred a liability to make future interest payments pursuant to interest swap agreements. Thus, under the regulations, the initial question is whether another provision of the Code or Regulations prescribes the tax treatment for interest swap agreements. This is a question of law that we review de novo. *Kikalos v. Comm'r*, 434 F.3d 977, 981-82 (7th Cir. 2006) (citations omitted).

A provision of the Code specifies the tax treatment that applies to interest swaps. Specifically, section 475, which is entitled "[m]ark to market accounting method for dealers in securities," provides that for "any security which is not inventory in the hands of the dealer and which is held at the close of any taxable year—(A) the dealer shall recognize gain or loss as if such security were sold for its fair market value on the last business day of such taxable year, and (B) any gain or loss shall be taken into account for such taxable year." 26 U.S.C. § 475(a)(2). "Securities" include interest swaps. 26 U.S.C. § 475(c)(2) (defining security to include "equity notional principal contract[s]" and "derivative financial instrument[s]"); 26 C.F.R. § 1.475(c)-1(a)(2)(ii) (including an interest swap dealer as an example of a dealer in securities). Therefore, section 475 provides the accounting methodology for interest swaps. Specifically, this section requires, as the heading for this section indicates, "mark-to-market" accounting in which the securities are "marked" to their market value at the end of each year. Thus, under the plain language of the Code, section 475(a)(2)(A) sets forth a method for valuing interest swaps: swaps must be valued at their fair market value on the last business day of the taxable year.[1]

---

[1] The relevant parts of 26 U.S.C. § 475 requiring mark-to-market
(continued...)

The taxpayer argues that the use of a reasonable account-ing method or a method that complies with generally accepted accounting principles ("GAAP") is sufficient to account for the fair market value under 475. As the tax court noted, GAAP requires that interest swaps be valued at their "fair value." 120 T.C. at 220 (citing Statement of Financial Accounting Standard 133). Essentially, the taxpayer argues that a "fair value" under GAAP is a "fair market value" that complies with section 475. Section 475(a)(2)(A), however, clearly and unambiguously mandates valuation at "fair market value," and not "fair value." *See* 120 T.C. at 303, 307-10 (distinguishing fair value from fair market value).[2]

---

(...continued)

accounting were enacted through the Omnibus Budget Reconcili-ation Act of 1993 and became effective for taxable years ended "on or after December 31, 1993." Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, § 13223, 107 Stat. 481. Accordingly, the taxpayer was required to comply with the mark-to-market method for the tax year ending in 1993. In the previous years, a mark-to-market method was not required. Even though the method was not required, the taxpayer used a mark-to-market method that was "substantially the same in each of the years 1990 through 1993." 120 T.C. at 280. Since the taxpayer used a mark-to-market method before it was required by section 475, our analysis of the application of mark-to-market accounting is the same for each of the years in question even though section 475 does not apply to the 1990-1992 periods. Furthermore, the taxpayer waived the argument that a more permissive, "reasonableness" standard applied for the 1990-1992 taxable years. *See* T.C. at 280. We therefore address all of the tax years at issue under the mark-to-market analysis of section 475.

[2] We note that the proposed regulation may render this distinc-
(continued...)

Financial accounting under GAAP and tax accounting methods under a uniform code may diverge, as the Supreme Court has observed by noting their "vastly different objectives." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 542 (1979). The Supreme Court elaborated:

> Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management. . . . Variances of this sort may be tolerable in financial reporting, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax.

*Id.* at 544 (footnotes omitted). GAAP compliance is not dispositive of compliance with the Code. *See Am. Fletcher Corp. v. United States*, 832 F.2d 436, 439 (7th Cir. 1987).

Thus, the court must determine whether the taxpayer's method produced a fair market value; the fact that it produces a fair value under GAAP is insufficient. The tax court determined that the taxpayer's fair value under GAAP

---

(...continued)

tion moot in future cases, since it would provide that "the value that the eligible taxpayer assigns to that eligible position in its applicable financial statement is the fair market value of the eligible position for purposes of section 475, even if that value is not the fair market value of the position for any other purpose of the internal revenue laws." 70 Fed. Reg. 29663 (text of proposed regulation 1.475(a)-4(b)(1)). As of August 7, 2006, our research indicates that the rule has not yet been finalized.

did not represent the fair market value of the interest swap.
In assessing the tax court's determination, we "review
factual determinations for clear error . . . [and] we review
applications of law to the facts for clear error." *Kikalos*, 434
F.3d at 981-82 (citations omitted). Clear error exists if, "on
reviewing the entire record, we are left with the definite and
firm conviction that a mistake has been committed." *Id.* at
982 (citation omitted).

The tax court's May 2, 2003, opinion carefully examines
the taxpayer's method for marking its interest swaps to
market and the various experts' analyses of the method. We
find no clear error in the tax court's conclusion that
the taxpayer's method did not produce a fair market
value of the swaps. First, the tax court found that the
taxpayer did not value its swaps on the last business day of
the taxable year, as the statute requires. This was not
disputed. The tax court further found that the taxpayer
failed to calculate the fair market value because its meth-
od did not account for both parties' credit rating in valu-
ing the swap (only making favorable adjustments if the
counter-party bore a worse credit rating than the taxpayer).
Additionally, the taxpayer did not consider that multiple
agreements with the same counter-party minimize the
risk of default. The tax court also found that the taxpayer's
method should have re-valued each swap annually to
represent properly the fair market value, instead of only
valuing the swap's projected value at its outset. Based on
these deficiencies, among others, the tax court concluded
that the taxpayer's valuation of the interest swaps did
not represent their fair market value. In reaching this
conclusion, the tax court relied on expert testimony, and
that testimony supported the tax court's conclusion. *See
Malachinski v. Comm'r*, 268 F.3d 497, 505 (7th Cir. 2001)
(noting tax court's "broad discretion to evaluate the over-
all cogency of each expert's analysis" (internal quotation

and citation omitted)). Accordingly, the tax court did not commit clear error in concluding that the taxpayer's method failed to produce a fair market value of the interest swaps.

Having rejected the taxpayer's method, the tax court proceeded to examine the Commissioner's method.[3] The tax court analyzed whether the Commissioner's own method produced the fair market value of the interest swaps. In doing so, however, the tax court failed to afford the Commissioner the deference due under the statutory scheme. Section 446, provides that "if the method used [by the taxpayer] does not clearly reflect income," such as occurred in this case in which the taxpayer's method fails to produce a fair market value, then "the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." 26 U.S.C. § 446(b). The method of determining "fair market value" under section 475 falls within the definition of "method." 26 C.F.R. § 1.446-1(a)(1) ("The term 'method of accounting' includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item."). We observe section 446 requires that the Commissioner's method "shall" be followed. 26 U.S.C. § 446(b); *see also Hansen v. Comm'r*, 360 U.S. 446, 467 (1959). Following this

---

[3] We note that the Commissioner did not cross-appeal the tax court's determination that its method did not clearly reflect income. This circuit has held that "[t]he filing of a cross-appeal is a jurisdictional prerequisite to our reversing any part of a district court's order." *Newman v. Indiana*, 129 F.3d 937, 941 (7th Cir. 1997) (citing *Young Radiator Co. v. Celotex Corp.*, 881 F.2d 1408, 1415-17 (7th Cir. 1989)). Because our broaching of this issue is interwoven with and necessary to analyze the taxpayer's appeal, and particularly because addressing this issue does not afford relief in favor of the Commissioner who prevailed below, we assert jurisdiction over this issue based on the taxpayer's own appeal.

language, the Supreme Court instructs that the Commissioner's "interpretation may not be set aside unless 'clearly unlawful' or 'plainly arbitrary.' " *Am. Fletcher*, 832 F.2d at 438 (citing *Thor Power Tool*, 439 U.S. at 532-33). Accordingly, the tax court was required to defer to the Commissioner's method of calculating fair market value.[4] *See Travelers Ins. Co. v. United States*, 303 F.3d 1373, 1384 (Fed. Cir. 2002).[5]

Deference to the Commissioner is appropriate because, as the Supreme Court has counseled, "[i]t is not the province of the court to weigh and determine the relative merits of systems of accounting." *Brown v. Helvering*, 291 U.S. 193, 204-05 (1934) (citing *Lucas v. Am. Code Co.*, 280 U.S. 445, 449 (1930)). As another circuit has stated, in situations in which a "taxpayer's method does not reflect his income . . . the Revenue Act contemplates action by the Commissioner, not

---

[4] We note again that the proposed regulations regarding mark-to-market accounting may render the particular application of the method disputed here inapplicable in the future. Academic literature has characterized the methodology at issue of using "the unadjusted midmarket value for most significant business purposes" as "outlying." Linda M. Beale, Book-Tax Conformity and the Corporate Tax Shelter Debate: Assessing the Proposed Section 475 Mark-to-Market Safe Harbor, 24 Va. Tax Rev. 301, 420 (2004) (emphasis omitted). The article further noted that the taxpayer's approach during the years at issue "cannot be considered illustrative of current practice," suggesting that this dispute may have little bearing on the current market or practices. *Id.* at 422.

[5] The Eighth Circuit appears to subscribe to a less deferential review of the Commissioner's method. *See Dayton Hudson Corp. v. Comm'r*, 153 F.3d 660, 664 (8th Cir. 1998). We find the deferential review described by the Federal Circuit in *Travelers*, 303 F.3d at 1383-84, to be more consistent with the plain language of section 446 and with Supreme Court precedent.

by the courts." *Harden v. Comm'r*, 223 F.2d 418, 421 (10th Cir. 1955). This does not mean that the Commissioner has unfettered discretion; his method may not be arbitrary or unlawful. *Am. Fletcher*, 832 F.2d at 438 (citing *Thor Power Tool*, 439 U.S. at 532-33). The courts may examine the Commissioner's method for arbitrariness or unlawfulness, but the examination must be made under this deferential standard.

In this case, although citing the arbitrary and unlawful standard, *see* 120 T.C. at 288, the tax court did not analyze the Commissioner's method under this standard, *see id.* at 329-330.[6] Instead, in a mere two pages of its 160-page opinion, the tax court rejected the Commissioner's method by finding that it did not clearly reflect income. Essentially, the tax court's holding that the Commissioner's method did not clearly reflect income eviscerates the statutory language that requires the use of a method that "*in the opinion of the Secretary*" clearly reflects income. 26 U.S.C. § 446(b) (emphasis added). Under the required deferential standard, the tax

---

[6] Although the details of the Commissioner's proposed method are not essential to our opinion, we note that the Commissioner proposed using the taxpayer's unadjusted midmarket values as the fair market value. Although the Commissioner agreed in principal with making adjustments to the midmarket values, the Commissioner did not find adjustments warranted in this case. On appeal, the Commissioner has maintained, as it did below, that the taxpayer's own reporting of the unadjusted values as well as its failure to maintain required records justified leaving the values unadjusted. We understand that the Commissioner would use a method that adjusts the midmarket value, but such a method was not appropriate or possible in this case because of the taxpayer's financial reporting statements and imperfect record keeping.

court had to do more than find that the Commissioner's method did not clearly reflect income; the tax court was required to determine whether the Commissioner's method was arbitrary or unlawful. *Am. Fletcher*, 832 F.2d at 438 (citing *Thor Power Tool*, 439 U.S. at 532-33). This deference is particularly warranted, given the peculiar record and circumstances of this case. In applying the arbitrary or unlawful standard, the tax court should bear in mind that the taxpayer retains the burden of proof, and any inadequacies with the Commissioner's method that are due to the taxpayer's failure to keep or provide records, to the extent that it affected the Commissioner's choice of method, may be taken into account. *See id.* at 442 (Cudahy, J., concurring) ("Taxpayers are required to keep adequate records to support their declaration of taxable income, and have no grounds to protest if the Commissioner imposes a workable accounting method when confronted with inadequate records."). We therefore vacate the tax court's determination that the Commissioner's method did not clearly reflect income and remand the case for the tax court to undertake this analysis under the proper arbitrary or unlawful standard.

On remand, if the tax court determines that the Commissioner's method is not arbitrary or unlawful, the Commissioner's method should be adopted and applied, or corrected. *See All-Steel Equip., Inc. v. Comm'r*, 467 F.2d 1184, 1185 (7th Cir. 1972) ("since the method used by taxpayer was unacceptable and since the taxpayer has not shown that the Commissioner's proposed [ ] method [ ] was arbitrary or unreasonable, substitution of the [Commissioner's] method (apart from certain errors of the Commissioner corrected by the Tax Court) was appropriate here."). If the Commissioner's method is arbitrary or unlawful, then the tax court will have to decide whether the taxpayer's method should

prevail or if the tax court has the authority to craft its own method.[7] In addressing these issues, the tax court and the parties may consider any lessons gleaned from the computations proceedings.

It would behoove the tax court and the parties on remand to focus narrowly on deciding the precise issues remaining in this case, and to make progress without duplicating the extensive work already invested in this case. Finally, although we need not reach the issue of computations that are contested on appeal, and without expressing any opinion as to the merits, we express concern about the perfunctory adoption of the Commissioner's computations, particularly in contrast to the extensive opinion on accounting methodology in this case. Greater explanation in deciding the vigorously contested points would facilitate any future appellate review of this case.

---

[7] Whether the tax court has the authority to craft its own method has not been addressed squarely in this circuit, and we decline to reach this issue here since the tax court's determination of arbitrariness or unlawfulness may render it unnecessary. We further note that this issue of the tax court's authority may be complicated in situations, such as this, where the taxpayer's method fails to comply with a statutory or regulatory requirement (in this case, that the accounting method produce a "fair market value" under 26 U.S.C. § 475). *See Consol. Mfg., Inc. v. Comm'r*, 249 F.3d 1231, 1239-41 (10th Cir. 2001). Nonetheless, we note that other courts have questioned the tax court's authority to craft its own accounting methods, which would have wide-ranging implications for numerous businesses. *See, e.g.*, *Brown*, 291 U.S. at 204-05; *Lucas*, 280 U.S. at 449; *Harden*, 223 F.2d at 421; *Caracci v. Comm'r*, ___ F.3d ___, ___ No. 02-60912, 2006 WL 1892600 at *11 (5th Cir. July 11, 2006).

### III.

Accordingly, we AFFIRM in part, VACATE in part, and REMAND to the tax court for further proceedings consistent with this opinion. Each party shall bear its own costs of this appeal.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*