In the

# United States Court of Appeals
## For the Seventh Circuit
———————

No. 07-3042

JPMORGAN CHASE & CO.
(Successor in interest to Bank One
Corporation, Successor in interest to
First Chicago NBD Corporation,
Formerly NBD Bankcorp, Inc.,
Successor in interest to First Chicago
Corporation) and Affiliated
Corporations,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

———————

Appeal from the United States Tax Court.
Nos. 5759-95 & 5956-97—**David Laro**, *Judge.*

———————

ARGUED MAY 29, 2008—DECIDED JULY 1, 2008

———————

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* This case concerns the taxation of
JPMorgan's income from swap transactions. JPMorgan
tried to carve out and defer a part of this income for cer-

tain costs and expenses associated with the swaps. The Commissioner of the Internal Revenue Service ("Commissioner"), and ultimately the Tax Court, concluded that these income deferrals were not proper, and that JPMorgan's valuation methodology did not clearly reflect income. JPMorgan then appealed the Tax Court's decision to this Court, and we remanded the case so that the Tax Court could apply a more deferential standard of review to the Commissioner's valuation methodology. After the proceedings below were again decided in the Commissioner's favor, JPMorgan now appeals here for a second time. On this appeal, JPMorgan does not contest the income deferral and valuation issues—it only disputes certain computations regarding the amounts of these carve-outs. Because we find no error in the Tax Court's acceptance of the Commissioner's computations, we affirm.

## I. Background[1]

JPMorgan Chase & Company ("JPMorgan")[2] is one of the largest dealers of a set of contracts known as "swaps." While the mechanics are not especially relevant in this case, these are essentially contracts between two parties designed to serve as protection against fluctuations embed-

---

[1] As this is the second time this case has come before this Court, and because we are addressing a fairly narrow issue, we will briefly restate only the relevant facts. For a more fulsome account of the background, see *JP Morgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006).

[2] JPMorgan brought this suit as successor and on behalf of its affiliated corporation, First National Bank of Chicago.

ded in an investment. These fluctuations can come from a number of sources, such as interest rates, commodities, or currencies. The two parties to a swap contract agree to exchange payments at specified intervals. The value inherent in a swap is a function of the difference between the amount of money that one party takes in from and gives out to the other party (i.e., the "counterparty"). To clarify, in the context of an interest rate swap, the magnitude of payments in both directions is determined by multiplying the relevant interest rate by some constant referred to as the "notional amount."[3] Usually, one party multiplies this notional amount by a fixed interest rate, and the other party multiplies this amount by a floating interest rate (e.g., the London Interbank Offered Rate). These payments are then exchanged, or swapped, periodically. If the floating rate is, for instance, below the fixed rate, the party paying out the floating rate takes in money, and the other party loses money on the swap.

In 1993, JPMorgan had at least 100 billion dollars worth of swaps on its books. Valuing these instruments even independent of this vast quantity can be difficult.[4] Even so, JPMorgan had to do so on an annual basis in order to

---

[3] What this amount actually is does not directly matter, because it does not actually get paid out. It is a constant that is usually tethered to the amount at stake in the underlying investment that the investor is trying to hedge.

[4] JPMorgan was on both the "fixed" and "floating" side of many of these transactions. The average of the difference between the rate it paid out and the rate it was paid, or the bid-ask spread, in regards to a particular swap was projected out for the term of the swap to arrive at a "midmarket value." This is the value that JPMorgan used to value its swaps.

report income accurately and pay taxes. At first, JPMorgan deferred a portion of this income for (1) administrative costs associated with handling the swaps, and (2) risk associated with counterparties who may default on their obligations. It is the latter portion of these deferrals—the credit risk—that is at issue in this appeal. Specifically, JPMorgan used two different methods to calculate the annual income deferrals associated with credit risk. The amount that it deferred was then "amortized," or put back, into income in some future year. The deferrals, known as "swap fee carve-outs," were designed to prevent the full valuation of a swap from being recognized up front.

In the Commissioner's view, JPMorgan's deferral accounting method did not clearly reflect income. Accordingly, JPMorgan received notices of deficiency from the Internal Revenue Service ("IRS") that, in essence, required it to add back the deferrals taken for administrative and credit risk costs into income for each relevant year. The amounts ranged from about $3.5 to $5.8 million each year, from 1990 through 1993. After receiving its first notice of deficiency, JPMorgan filed suit in the Tax Court arguing that its method of deferral accounting (which deferred income to match related expenses) was an accurate way to reflect income. While the case was being argued in that court, JPMorgan turned about-face and conceded that the deferral method was actually not allowed under these circumstances.

The Tax Court then issued its ruling and concluded that neither party's method for calculating income was appropriate. Understanding these various methods for valuing swaps is not specifically relevant to the issue in this appeal, but we mention and summarize them for

completeness. Overall, the Tax Court agreed with the Commissioner that JPMorgan could not defer swap-related income associated with administrative costs and credit risk. But it also determined that these amounts should not be fully added back into income for the years 1990 through 1993. Instead, it advocated an "adjusted midmarket valuation" which would essentially allow for no deferrals and exclude the income associated with administrative costs and credit risk. The Commissioner agreed with this methodology in theory, but believed that JPMorgan's method for calculating administrative cost and credit risk deferrals was flawed. From the Commissioner's perspective, JPMorgan's poor recordkeeping made it difficult to ascertain the extent to which the midmarket value should be adjusted for credit risk-related expenses.

Regardless, the Tax Court then ordered the parties to compute JPMorgan's deficiency given this new valuation methodology pursuant to Tax Court Rule 155.[5] JPMorgan and the Commissioner came to an agreement regarding administrative costs for each year and for credit risk in 1993, but they could not reach an agreement on the amount of credit risk deferrals taken from 1990 to 1992. The Commissioner calculated this amount

---

[5] Tax Court Rule 155(a) provides that after the court files its opinion "determining the issues in a case, it may withhold entry of its decision for the purpose of permitting the parties to submit computations pursuant to the court's determination of the issues, showing the correct amount of the deficiency . . . to be entered as the decision." The parties are allowed to provide separate computations where they do not agree on the computations.

to be approximately $14.4 million total from 1990 to 1993. It relied primarily on the notices of deficiency for arriving at this value because, in its view, JPMorgan did not keep the statutorily mandated records that would be needed to arrive at a more precise estimate. In contrast, JPMorgan capped this amount at approximately $3.6 million total over the 1990-1993 period, and relied on a disputed summary chart (prepared for this litigation) to arrive at this result. The Tax Court was not pleased with either result, and ordered both parties to submit supplemental computations. Nothing new surfaced in these additional proceedings. The Tax Court then entered its decision in favor of the Commissioner's computations.

JPMorgan then appealed the decision to this court and challenged both the Tax Court's valuation methodology and the Rule 155 computations. We did not reach the substance of this issue because we remanded back to the Tax Court on the grounds that it should apply a deferential standard of review to the Commissioner's method of accounting for the swap valuations. In that decision, we concluded that deference to the Commissioner's method was due "particularly . . . given the peculiar record and circumstances of this case," including "taxpayer's failure to keep or provide records." *JP Morgan*, 458 F.3d at 571. At the same time, however, we expressed "concern about the perfunctory adoption of the Commissioner's computations" and requested "[g]reater explanation" regarding the computations. *Id.* at 572.

On remand, the Tax Court did provide a more robust account of why it agreed with the Commissioner's computations. It found that JPMorgan had failed to demonstrate that the cumulative effect of removing its improper credit risk deferrals was capped at $3.6 million for the

years at issue, rather than the $14.4 million advocated by the Commissioner and reflected in its previous decisions. The Tax Court chose this route[6] because JPMorgan's computations were not supported by the record and violated the principle of annual accounting (i.e., it only gave a total amount for the three years, as opposed to a year-by-year breakdown). It also refused to adopt the numbers contained in JPMorgan's summary chart, Exhibit 149-P. JPMorgan then filed a motion to vacate and both parties reiterated the same arguments made above. The Tax Court denied this motion for similar reasons: there was no credible evidence of the credit risk deferrals. Given the deficiencies in the record, the Tax Court did not know whether the actual amount of JPMorgan's credit risk deferrals was the amount computed by the Commissioner, the amount computed by JPMorgan, or whether the actual amount was closer to one or the other. In sum, the Tax Court found that it did not want to "reward[ ] [taxpayer] and its successors for their lack of recordkeeping or, in other words, allow[ ] [taxpayer] to escape taxation."

## II. Discussion

In this second appeal, JPMorgan does not challenge the Tax Court's valuation methodology; it only disputes its

---

[6] There was a three-step procedure involved here: (1) an adjustment to reverse the annual decreases to swap income from the initial credit risk deferrals in each year for 1990-1993; (2) an adjustment pursuant to I.R.C. § 481 to correct for the previously omitted income in prior years (i.e., in pre-1990 years) and return those previously claimed deferrals to income; and (3) an adjustment to reverse the amortization into income of the disallowed deferrals.

acceptance of the Commissioner's Rule 155 computations. We review the Tax Court's adoption of computations submitted by one or the other of the parties pursuant to Tax Court Rule 155 for an abuse of discretion. *Chimblo v. Commissioner*, 177 F.3d 119, 127 (2d Cir. 1999). Rule 155 proceedings are limited to purely computational items that must, by the terms of the rule, be consistent with the findings and conclusions of the Tax Court's opinion. Tax Ct. R. 155(b). If the parties disagree as to the amount to be entered as the decision, then each party may file with the Tax Court a separate computation that it believes is in accord with the court's findings and conclusions. The Tax Court will then enter its decision. *Id.*

Crucially, the "starting point for the [Rule 155] computation is the statutory notice of deficiency from which the parties compute the redetermined deficiency based upon matters agreed by the parties or ruled upon by the Court." *Home Group, Inc. v. Commissioner*, 91 T.C. 265, 269 (1988), *aff'd* 875 F.2d 377 (2d Cir. 1989). As a general matter, the Commissioner's deficiency determinations are "presumptively correct," and "the taxpayer has the burden of proving otherwise." *Zuhone v. Commissioner*, 883 F.2d 1317, 1323 (7th Cir. 1989). Additionally, taxpayers are required to keep adequate records from which their correct tax liability may be determined. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1 (26 C.F.R.). Indeed, in the previous incarnation of this case, we noted that "the tax court should bear in mind that the taxpayer retains the burden of proof, and any inadequacies with the Commissioner's method that are due to taxpayer's failure to keep or provide records . . . may be taken into account." *JP Morgan*, 458 F.3d at 571.

Here, the Tax Court found (as both parties had stipulated) that JPMorgan had deferred $981,995 of swap in-

come for credit risk in 1993, but it did not make specific findings for 1990-1992. The Commissioner argues that JPMorgan failed to substantiate the amounts of its credit risk deferrals and amortization for 1990-1992 and that, for those years, the amounts contained in the notices of deficiency should be used because the taxpayer bears the burden of proving error in the deficiency notices. JPMorgan argued that the notices of deficiency were arbitrary and excessive. The Tax Court held to the contrary and found that (1) the notices of deficiency were not arbitrary or excessive; (2) the taxpayer bore the burden of disproving the deferral amounts set out in the notices; (3) the only credit risk deferral amount that JPMorgan established was that for 1993; and (4) the only credit risk amortization JPMorgan established was the stipulated amount of credit risk deferrals amortized in 1993. To get at credit risk for 1990-1992, the Commissioner took the notices of deficiency which contained credit risk deferrals and administrative cost deferrals for that period, and subtracted the latter quantity. The bottom line here, from the Commissioner's perspective, is that the deficiency determinations are presumptively correct, and JPMorgan did not produce countervailing evidence (and in fact produced a dearth of evidence, which led to the use of the deficiency determinations) to rebut its correctness.

JPMorgan argues that the Tax Court's partial rejection of the government's valuation methodology negates the presumption of correctness associated with the notices of deficiency. This argument seems to have some surface appeal, but there is not basis for it in the law. To be sure, the Tax Court explicitly upheld the Commissioner's determination to disallow taxpayer's deferral accounting method. It is true that the Tax Court rejected the midmarket (government) valuation approach for an

adjusted midmarket approach, but that does not take away from the presumption of correctness associated with the notices of deficiency. The Tax Court determined that the original deficiency determination should be corrected, but that too does not diminish its value. *See Paccar, Inc. v. Commissioner*, 849 F.2d 393, 400 (9th Cir. 1988) ("Where the Commissioner has conceded errors in his original computations, and the tax court has sustained the Commissioner's corrected determination, those errors are not a basis for overcoming the presumption of correctness.").

Apart from whether there is a presumption of correctness that attaches to the notices of deficiency, JPMorgan asserts that it has presented sufficient evidence to show that the amounts contained in the notices are not accurate. Specifically, it relies on Exhibit 149-P, which is a summary chart that purportedly displays accumulated credit risk reserve balances. This chart indicates that the credit risk reserve balance at the end of 1993 was $3.6 million. The logic of JPMorgan's argument is as follows: we know the amount of this balance at the end of 1993, and we know the extent of credit risk deferrals taken in 1993 (about $900,000), and so we can subtract these values to arrive at a credit risk reserve balance for the end of 1992. This is how JPMorgan arrives at its $2.7 million figure, which it believes represents the total amount of credit risk deferrals that can be added back into income for the 1990-1992 period. How this $2.7 million is to be allocated for each year is of no moment, JPMorgan maintains. The simple point is that the total amount that is to be allocated for 1990-1993 cannot exceed $3.6 million, and is certainly nowhere near the $14.4 million figure put forth by the government.

The fatal flaw in JPMorgan's argument is that it assumes that the $3.6 million figure is accurate—it is not. This is true for at least two reasons. First, the figure is derived from Exhibit 149-P, which purports to summarize all outstanding credit risk deferrals recorded in a particular piece of equipment known as the "Devon System." But JPMorgan, *by its own admission*, conceded that the Devon System was not used to value *all* of its swaps. For instance, in its own findings of fact in the Tax Court, JPMorgan notes that it used "a different system to compute mid-market values" for "commodity swaps." Additionally, it admits that "Devon was not used to value" a set of currency swaps. Second, JPMorgan has not made any efforts to demonstrate the exhibit's accuracy in regards to those swaps that it actually does value. The exhibit is merely a one-page summary of over 600 pages of reports that were not admitted into evidence. Moreover, the exhibit is labeled as a "Summary of Monthly Devon Reports," but many months (e.g., January through September of 1991) are missing. JPMorgan cannot overcome the presumption of correctness connected with the Commissioner's notices of deficiency with an oversimplified, unsubstantiated, and incomplete one-page summary chart.

What JPMorgan had to do here was present the same information to the Tax Court regarding its 1990-1992 swap transactions that it presented for its 1993 transactions. JPMorgan complied with I.R.C. § 6001's record-keeping requirement that year and was able to demonstrate that it entered into 488 swap transactions in 1993. The anemic records prevented the Tax Court from making similar findings for the previous years in question. JPMorgan cites two cases, *Transport Mfg. & Equip. Co. v. Commissioner*, 374 F.2d 173 (8th Cir. 1967), and *Commissioner*

*v. Jacobson*, 164 F.2d 594 (7th Cir. 1947), for the proposition that the Tax Court should not solely rely on notices of deficiency when making Rule 155 computations. Nobody disagrees with this point as a general matter—the Tax Court's hands were tied here because of the dearth of evidence produced by JPMorgan for 1990-1992. It is precisely *because* of situations like this that we have presumptions and burdens of proof. The Tax Court even gave JPMorgan a second chance on remand to establish credit risk deferrals and related amortization for 1990-1992, and it squandered this opportunity by failing to produce additional evidence and obstinately relying on Exhibit 149-P. We must therefore conclude that "in arriving at the tax deficiency, the Tax Court, as the trier of the facts, is warranted in bearing heavily against the taxpayer, whose own failure to keep records has created the dilemma." *Mitchell v. Commissioner*, 416 F.2d 101, 103 (7th Cir. 1969). The Tax Court is not required to take a stab in the dark, particularly when the party asking it to do so has turned out the lights.

## III. Conclusion

For the foregoing reasons, we AFFIRM the Tax Court's judgment.