T.C. Memo. 2006-212

UNITED STATES TAX COURT

ROBERT DALLAS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7493-04.                    Filed September 28, 2006.

<u>John M. Elias</u>, <u>Peter J. Ulrich</u>, <u>Rita M. Danylchuk</u>, and <u>Laura Lavie</u>, for petitioner.[*]

<u>Wendy D. Gardner</u> and <u>Brian E. Derdowski, Jr.</u>, for respondent.

---

[*]  <u>Kenneth N. Laptook</u> was substituted as counsel for John M. Elias after trial, and all briefs except respondent's response to petitioner's supplement to reply brief were filed.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Chief Judge</u>:  Respondent determined deficiencies in petitioner's gift tax of $1,715,526 for 1999 and $823,160 for 2000.[1]

Petitioner transferred about 55 percent of the nonvoting stock of the Dallas Group of America, Inc. (DGA), an S corporation the stock of which is not publicly traded, to trusts established for the benefit of his sons (the trusts) in exchange for cash and promissory notes signed by his sons.  The transfers occurred on November 29, 1999 and 2000.  Petitioner and his sons agreed to be bound by a value for DGA stock as estimated in a third-party appraisal.  Each promissory note used to pay for the stock at issue in 1999 provides it is deemed paid if petitioner dies before it is paid.  Respondent determined that the transactions were bargain sales and thus were gifts.  The issues for decision are:

1.  Whether the value of the DGA stock at issue on November 29, 1999, was $907 as respondent determined or $620 as petitioner contends; and whether the value of the DGA stock at issue on November 29, 2000, was $906 as respondent determined or $650 as petitioner contends.  We hold that the fair market value of the

---

[1]  Amounts are rounded to the nearest dollar.

DGA stock was $751 per share on November 29, 1999, and $801 per share on November 29, 2000.

2. Whether the value of each 1999 note was $2,232,000, as petitioner contends, or $1,687,704 as respondent determined. We hold that it was $1,687,704.

Unless otherwise specified, section references are to the Internal Revenue Code as in effect for 1999 and 2000, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioner

Petitioner resided in Whitehouse, New Jersey, when he filed the petition in this case. He was 84 years old at the time of trial.

B. Dallas Group of America

1. Reagent Chemical & Research., Inc.

In 1959, petitioner and Thomas Skeuse (Skeuse) formed Reagent Chemical & Research, Inc. (Reagent), in Texas. Reagent initially processed elemental sulfur and later distributed hydrochloric acid. In the 1970s, Reagent expanded into the ammonium chloride and magnesium silicate businesses.

2. Formation of Dallas Group of America, Inc.

In February 1989, petitioner and Skeuse decided to split their interests in Reagent. Reagent spun off its ammonium

chloride and magnesium silicate divisions to form Dallas Group of America, Inc. (DGA), the stock of which petitioner received in exchange for his interest in Reagent. DGA manufactures and distributes ammonium chloride and synthetic magnesium silicate. Its headquarters is in Whitehouse, New Jersey. It is an S corporation for Federal income tax purposes.

DGA had nonoperating assets including 79 percent of Trenton Liberty Insurance Co.,[2] Unity Bankcorp, Inc. stock, land in New Jersey, and split-dollar insurance receivables in 1999 and 2000.

3.    Ammonium Chloride and Magnesium Silicate Production

In the mid-1990s, DGA sold ammonium chloride to about 130 different distributors in volumes of at least one truckload. Ammonium chloride is used as an ingredient in fertilizer, cattle feed, cough medicine, and intravenous solutions, and in personal products such as cosmetics and shampoo. It is also used in galvanizing metal, producing dry cell batteries, growing baker's yeast, and servicing oil wells. As of September 1999, DGA supplied about 90 percent of the ammonium chloride used in the United States and Canada, or 18,000 tons per year, and exported about 5,000 tons per year. About 29 percent of DGA's gross revenue from 1998 to 2000 was from sales of ammonium chloride.

---

[2] Trenton Liberty Insurance Co. was formed to provide product liability insurance for DGA.

DGA also manufactures synthetic magnesium silicate.  DGA is the only manufacturer of synthetic magnesium silicate in the Western Hemisphere.  It markets this product under the trade name Magnesol.

About 50 percent of DGA's sales of Magnesol are to fast food chains such as McDonald's (DGA's largest customer), which use Magnesol to filter frying oil from other compounds to extend the life of the frying oil.  About 40 percent of DGA's sales of Magnesol are for use in the manufacture of polymers.  Ten to twenty percent of DGA's sales of Magnasol are to international food services and industries.  About 70 percent of DGA's gross revenue in 1999-2000 was from sales of Magnasol.

4.   <u>Financial Status and Senior Management</u>

Petitioner chairs DGA's board.  His son, Robert Dallas II (Robert), is president, his son, David Dallas (David), is chief executive officer, and John Felowitz (Felowitz) is chief financial officer and executive vice president.  David has worked for Reagent or DGA since 1974, and Robert has worked for either Reagent or DGA since 1972.  DGA paid petitioner and his two sons salaries and bonuses in the following amounts in 1998, 1999, and 2000:

|  | 1998 | 1999 | 2000 |
|---|---|---|---|
| Petitioner |  |  |  |
|     Salary | $873,224 | $983,164 | $733,229 |
| Robert |  |  |  |
|     Salary | 833,851 | 785,709 | 821,253 |
|     Bonus | 250,000 | -- | -- |
| David |  |  |  |
|     Salary | 831,238 | 785,275 | 820,931 |
|     Bonus | 250,000 | -- | -- |
|      Total | 3,038,313 | 2,554,148 | 2,375,413 |

Petitioner originally owned all of DGA's series A voting stock and series B nonvoting stock. Paul Rosenberg (Rosenberg) and Steven Holt (Holt) were petitioner's estate planning counsel. They recommended that petitioner use grantor retained annuity trusts (GRATs) and an estate freeze as part of his estate plan.

In 1992, petitioner and his wife, Fay Dallas (Fay), formed two GRATs and contributed 4,100 shares of DGA's series B stock to each trust. Petitioner transferred another 7,000 shares to Fay in 1998. Fay died on January 24, 1999. At that time she owned the 7,000 shares.

Rosenberg recommended that Fay's estate retain Empire Valuation Consultants, Inc. (Empire), a business appraiser, to appraise the stock as of the date Fay died. Empire appraised the stock in a report dated October 28, 1999.

Empire used a capitalization of income approach to estimate the value of DGA stock. In doing so, Empire opined that a

reasonable buyer would assume that DGA's net income would be reduced by 40 percent due to tax-affecting.[3]

Empire also assumed that executive compensation for petitioner and his sons would be set at about $1.4 million per year, causing DGA's future annual earnings to increase. Empire applied a 15-percent discount for lack of control and a 35-percent discount for lack of marketability. Empire concluded that the fair market value of a minority interest of DGA stock was $610 per share as of January 24, 1999.

The GRATs terminated in 1999, and 4,100 shares of DGA stock were transferred to Robert and David. Also in 1999, petitioner acquired 78 additional shares of series B stock.

DGA used retained earnings to expand. DGA paid enough dividends to its shareholders (petitioner, his sons, and the trusts established for his sons) to pay income tax that resulted from dividend distributions.

---

[3] Generally speaking, in the context of valuation of stock of an S corporation, "tax-affecting" is the discounting of estimated future corporate earnings on the basis of assumed future tax burdens imposed on those earnings, such as from the loss of S corporation status and imposition of corporate-level tax. See Gross v. Commissioner, T.C. Memo. 1999-254, affd. 272 F.3d 333 (6th Cir. 2001); Bogdanski, Federal Tax Valuation, par. 6.03[6][e][i], at S-36-38 (2006 & Supp. 2006).

C.   Stock Transfers to Petitioner's Children

1.   1999 Stock Transfers From Petitioner to His Sons

On a date not stated in the record, Rosenberg advised petitioner to transfer stock of DGA to trusts established for the benefit of his sons in exchange for cash and notes signed by his sons as trustees of the trusts for their benefit promising to pay for the stock.  Petitioner wanted the notes to be deemed paid in full if he died before all payments were made.[4]

Rosenberg and Holt chose Empire to appraise DGA's series B stock to determine the price for a sale of the stock by petitioner to the trusts.  Petitioner and his sons agreed that the trusts would buy the stock at the price set by Empire.

Empire prepared a report dated November 15, 1999, and sent it to Felowitz.  Empire concluded that the fair market value of the series B shares was $620 as of September 30, 1999.  Empire used the same methodology that it had used to appraise the DGA shares held by Fay's estate.  See par. B-4, above.

On November 29, 1999, petitioner transferred 4,000 shares of series B stock to the trust established for the benefit of Robert and 4,000 shares to the trust established for the benefit of David.  In return, each trust transferred to petitioner $248,000 in cash and a promissory note for $2,232,000 (collectively the

---

[4]   If the notes were deemed prepaid when petitioner died, the value of the notes would not be included in his estate.

1999 notes), on the basis of Empire's estimate of the value of the DGA stock at issue in 1999 ($620).

Petitioner and his sons signed the sale agreements and promissory notes. The sale agreements included the following share adjustment clause:

> In the event that the value of the Shares is finally determined in any IRS proceeding to be greater than $620 per share, the number of shares purchased and sold hereunder shall be reduced to the number which is the quotient of $2,480,000 divided by the value per share determined in such proceeding. In such event, Buyer shall transfer to Seller, for no additional consideration, the number of Shares which is equal to the difference between 4,000 minus the quotient determined under this Section 1.2.

The 1999 notes[5] include the following self-canceling clause:

> In the event that Holder shall die before the Maturity Date, this note shall be deemed to have been paid, satisfied and discharged on the day before the date of the Holder's death.

In 1999, Fay's estate distributed 544 shares of series B stock to Robert and 544 shares to David.

2. 2000 Stock Transfers From Petitioner to His Sons

On November 29, 2000, Fay's estate and the trusts signed an agreement under which the estate transferred 2,956 shares of series B stock to each of the trusts, and each trust transferred to the estate $192,140 in cash and a promissory note for $1,729,260 (collectively the 2000 notes), on the basis of

---

[5] The maturity date of the 1999 notes is Nov. 29, 2004.

Felowitz's estimate that the stock was worth $650 per share.[6]
Felowitz assumed that Empire had correctly valued DGA stock at
$620 per share as of November 29, 1999, and estimated that the
value had increased to $650 per share as of November 29, 2000.

The 2000 sale agreements between Fay's estate and the trusts
had the following share adjustment clause:

> In the event that the value of the Shares is finally
> determined in any IRS proceeding to be greater than
> $650 per share, the number of shares purchased and sold
> hereunder shall be reduced to the number which is the
> quotient of $1,921,400 divided by the value per share
> determined in such proceeding.  In such event, Buyer
> shall transfer to Seller, for no additional
> consideration, the number of Shares which is equal to
> the difference between 2,956 minus the quotient
> determined under this Section 1.3.

The 2000 notes did not have a self-canceling clause.

Respondent audited petitioner's 1999 gift tax return in
2001.  During the audit, respondent's tax examiner told Rosenberg
that the 1999 notes were self-canceling and thus were worth less
than face value because the notes were canceled if the holder of
the notes died before payment.

On June 21, 2001, after respondent's tax examiner told
Rosenberg about the self-canceling 1999 notes, petitioner and the
trustees of the trusts executed new promissory notes that were

---

[6]  The parties do not dispute that the transfers on Nov. 29,
2000, are treated as made by petitioner because the shares of DGA
transferred in the 2000 transaction would have passed to him if
Fay's estate had not transferred them to the trusts.

substantially identical to the original notes except that they did not contain the self-canceling clauses.

After all of the above transactions, the 25,078 shares of series B stock were owned as follows:

| Individual | Number of shares |
| --- | --- |
| Petitioner | 1,878 |
| Robert | 4,644 |
| David | 4,644 |
| Robert's trust | 6,956 |
| David's trust | 6,956 |

D. Respondent's Determinations

Respondent determined: (1) The DGA stock at issue had a fair market value of $907 per share on November 29, 1999, and $906 per share on November 29, 2000; (2) each of the 1999 notes, which had a face value of $2,232,000, had a fair market value of $1,687,704; and (3) petitioner is liable for gift tax as a result of these transfers because he received consideration worth less than the fair market value of the transferred stock.

OPINION

A. Contentions of the Parties

Petitioner contends that the fact that the price paid for the DGA stock at issue in November 29, 1999, was set by Empire, an unrelated third-party appraiser, means the price was the fair market value. Petitioner also contends that testimony of his expert witnesses supports Empire's estimate of the value. Respondent disagrees with petitioner's contentions.

B.   Whether the Price for the DGA Stock at Issue Was an Arm's-Length Price

Petitioner points out that the 1999 price paid for the DGA stock at issue was set by Empire and contends that the parties properly structured and documented the sales of stock at issue as arm's-length transactions, thus establishing the fair market value of the DGA stock at issue.  We disagree.

Intrafamily transfers are presumed to be gifts.  Frazee v. Commissioner, 98 T.C. 554, 561 (1992); Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).  While the presumption may be overcome with evidence, see, e.g., Estate of Stone v. Commissioner, T.C. Memo. 2003-309, we conclude that petitioner has not done so.

The transactions were designed by petitioner's counsel to serve petitioner's estate planning goals.  The facts that payment of the 1999 notes need not have been made if petitioner had not survived until they were due[7] and that the 1999 and 2000 notes contain a share adjustment clause show that the transactions were for estate planning purposes.

Petitioner's sons were not represented by their own counsel in the transactions.  Petitioner's sons did not negotiate the terms of the agreements, and while that is not dispositive, see Estate of Thompson v. Commissioner, 382 F.3d 367, 382 (3d Cir.

_____

[7] See discussion of the self-canceling clauses below at par. D.

2004), affg. T.C. Memo. 2002-246, it is a factor suggesting the lack of arm's-length transactions in these circumstances.  See Harwood v. Commissioner, supra at 259 (family transaction structured by the family accountant with no arm's-length bargaining did not overcome the family transaction presumption); cf. Estate of Stone v. Commissioner, supra (arm's-length transaction where each member of the Stone family negotiated the transaction through his or her own independent counsel).

We conclude that the prices petitioner's sons agreed to pay for the DGA stock at issue were not arm's-length prices.

C.  Expert Testimony

1.  Introduction

We next consider the matters disputed by the expert witnesses who testified as to the value of the DGA stock at issue.  Empire and Management Planning, Inc. (MPI), each submitted an expert report for petitioner.  Scott A. Nammacher (Nammacher) testified for Empire, and Robert P. Oliver (Oliver) and Joseph C. Hassan (Hassan) testified for MPI.  Appraisal Economics, Inc. (AE), submitted an expert report for respondent. T. Scott Vandervliet (Vandervliet) and Joseph G. Kettell (Kettell) testified for AE.

The primary points of disagreement among the expert witnesses were:  (1) Whether to decrease the assumed income stream from DGA because of tax burdens imposed on DGA or its

shareholders after the hypothetical sale (i.e., tax-affecting); (2) whether to increase DGA's assumed income stream on the assumption that DGA's executive compensation will decrease after the hypothetical sale; and (3) whether, and if so, to what extent, to apply discounts for lack of control, lack of voting power, and lack of marketability.

The following chart summarizes the positions taken in the expert reports:

| | Empire (Nammacher) | MPI (Oliver, Hassan) | AE (Vandervliet, Kettell) |
|---|---|---|---|
| Valuation methods | Capitalization of income | Discounted cash flow; guideline company | Capitalization of income; guideline company; guideline transactions |
| Capitalization rates | 15.57% for 1999 | 16.5% for 1999; 15.5% for 2000 | 16% for 1999; 15% for 2000 |
| Tax-affecting | Reduced net earnings by 40% | Reduced net earnings by 35% | None |
| Executive compensation adjustment | Reduced expenses by $1.4 million for 1998; compensation adjusted 8% per year for 1994-98 | None | Reduced expenses by $1.3 million for 1999, compensation adjusted 5% per year for 1994-2000 |
| Discounts | 15% minority interest and lack of control for nonoperating assets; 35% lack of marketability | 40% lack of marketability; 5% lack of voting power | 20% minority interest and lack of control for operating assets; 15% minority interest and lack of control for nonoperating assets; 20% lack of marketability |
| 1999 per-share value | $620 | $528 | $1,004 |
| 2000 per-share value | None given | $584 | $1,026 |

We may accept or reject expert testimony according to our own judgment, and we may be selective in deciding what parts of an expert's opinion, if any, we accept. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938). In general, we found AE's report and the testimony of Vandervliet and Kettell to be more

convincing than Empire's and MPI's reports and the testimony in support of those reports. AE's report and the testimony of Vandervliet and Kettell were cogent and thorough. Vandervliet and Kettell wrote the AE report and explained it clearly. Empire's letter report was, by its terms, limited. Nammacher's testimony in support of Empire's report was unconvincing for reasons stated at paragraph C-2-b-ii, below. MPI copied portions of its report verbatim from the Empire report.

2. Tax-Affecting

a. Background

Petitioner's expert witnesses reduced DGA's projected income by 40 percent (Empire) and 35 percent (MPI) based on "tax-affecting". Empire reduced DGA's projected profits by 40 percent on the assumption that, after a sale, the corporation will lose its S corporation status.[8] See, e.g., Gross v. Commissioner, T.C. Memo. 1999-254, affd. 272 F.3d 333 (6th Cir. 2001). MPI reduced DGA's projected profits by 35 percent because a shareholder is

---

[8] The income of a C corporation is subject to income tax at the corporate level, and shareholders are taxed on dividends paid by a C corporation. Secs. 11, 61. In contrast, the income of an S corporation generally is not taxed at the corporate level, but is passed through to the shareholder and taxed to the shareholder when earned, whether or not the corporation pays dividends. Sec. 1366.

Nammacher's testimony suggests that Empire tax-affected DGA's earnings on the assumption that DGA would lose its S corporation status after or as a result of the hypothetical sale of its stock. Oliver testified that this is why MPI tax-affected DGA's earnings.

liable for income tax on S corporation profits even if those profits are not distributed to the shareholder.

b.    Whether To Assume DGA Would Cease Being an S Corporation

Petitioner points out that DGA's S corporation election could be ended at any time.  Petitioner also points out that some potential buyers (e.g., C corporations) of DGA stock are not qualified to be S corporation shareholders.  See secs. 1361(b)(1), 1362(d)(2).

There is no evidence in the record that DGA expects to cease to qualify as an S corporation.  DGA has a history of distributing enough earnings for shareholders to pay their individual income tax liabilities on DGA's earnings.  There is no evidence that DGA intends to change its practice of distributing enough to cover individual income tax liability.[9]  See Davis v.

---

[9]  Petitioner contends that DGA's practice of distributing only enough to cover individual income tax liability distinguishes this case from Gross v. Commissioner, T.C. Memo. 1999-254, in which the corporation distributed substantially all of its income, and thus tax-affecting is appropriate here. Whether tax-affecting applies turns on valuation principles including consideration of the hypothetical willing seller and buyer, the experts, and specific facts of the case, Gross v. Commissioner, 272 F.3d at 351-352, and not necessarily on formulas and opinions proffered by an expert witness, see Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part on another ground T.C. Memo. 1956-178; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). In addition, petitioner misunderstands our analysis of the effect of a shareholder-level tax in Gross v. Commissioner, supra.  Our analysis did not depend on the proportion of corporate income
(continued...)

Commissioner, 110 T.C. 530, 559 (1998).  The assumptions of petitioner's witnesses that a hypothetical buyer and seller would assume without any supporting evidence that those events would occur detracts from the credibility of their opinions.  See Gross v. Commissioner, 272 F.3d at 351-355.

Petitioner contends that the testimony of Oliver and Nammacher establishes that a hypothetical willing buyer would tax-affect earnings in valuing DGA stock.  We disagree.

### i.   Oliver's Testimony

Oliver initially testified that MPI tax-affected DGA's earnings to apply C corporation tax rates and later testified that MPI reduced DGA's earnings to reflect individual income tax rates.  Oliver was substantially unfamiliar with the MPI report.[10] The MPI report contained passages lifted verbatim from the Empire report.  We give Oliver's testimony little weight.

---

[9](...continued)
distributed.  We said that, in determining the present value of an expected stream of earnings, any tax-affecting to reflect the shareholder-level tax burden should be done equally (or not at all) to both the discount rate and the expected cashflows, with the result that, in either case, the present value determined would be the same.  That analysis is independent of the proportion of earnings distributed.

[10]  Petitioner also called Hassan, another MPI employee, as a witness.  However, Hassan did not testify about tax-affecting, executive compensation, or discounts.

### ii. Nammacher's Testimony

Nammacher testified that: (1) He has always tax-affected S corporation income for the past 20 years;[11] (2) an informal poll at a recent conference showed 90 to 95 percent of responding appraisers tax-affect S corporation income; (3) the American Society of Appraisers (ASA) Board of Review rejects any application for certification if the candidate submits test answers or reports for review that do not tax-affect S corporation income; (4) his experience is that all bankers, investment bankers, and business brokers use tax-affecting in estimating the value of S corporation stock; and (5) Empire uses tax-affecting in valuing S corporation stock held by employee stock ownership plans (ESOP) that it submits to the Department of Labor.

We give little weight to Nammacher's testimony about an informal poll at an unidentified conference held on a date not stated in the record. Nammacher admitted that ASA has never issued an official directive or recommendation on tax-affecting S corporations' earnings.

Nammacher's claim that ASA's Board of Review rejects test answers or reports by a candidate applying for ASA certification

---

[11] Nammacher's testimony about whether the tax-affecting adjustment was based on individual or corporate income tax rates was vague and suggests that Empire applied tax-affecting based on C corporation income tax rates.

which do not apply tax-affecting is unpersuasive because Kettell testified that ASA's Board of Examiners approved Kettell for ASA certification even though he submitted a report to the board that did not tax-affect S corporation income. Respondent's expert witnesses do not automatically tax-affect all S corporation earnings.

Nammacher's testimony about valuing ESOP stock for the Department of Labor is not convincing because there is no evidence that the Department of Labor's definition of value is similar to the definition of fair market value in this case.

### c. Del. Open MRI Radiology Associates, P.A. v. Kessler

Petitioner contends that the reasoning in Del. Open MRI Radiology Associates, P.A. v. Kessler, 898 A.2d 290 (Del. Ch. 2006), supports application of tax-affecting in this case. We disagree. The issue in Del. Open MRI was whether the minority stockholders of Delaware Open MRI Radiology Associates, P.A., received fair value of the going concern in a merger (fair merger price). Id. at 299, 310. The court of chancery said the fair merger price had to take into account the loss of the favorable tax treatment for the S corporation shareholders. Id. at 326. The fair merger price reflected equitable considerations including the possibility that in a merger minority shareholders might be squeezed out. Id. at 311-312.

"Fair value" in minority stock appraisal cases is not equivalent to "fair market value". Swope v. Siegel-Robert, Inc., 243 F.3d 486, 492-493 (8th Cir. 2001); Union Ill. 1995 Inv. L.P. v. Union Fin. Group, Ltd., 847 A.2d 340, 355 (Del. Ch. 2003); see Cavalier Oil Corp. v. Harnett, 564 A.2d 1137 (Del. 1989); see also JPMorgan Chase & Co. v. Commissioner, 458 F.3d 564, 569 (7th Cir. 2006), affg. in part, vacating in part and remanding Bank One Corp. v. Commissioner, 120 T.C. 174 (2003). In Del. Open MRI the court of chancery used a method to estimate the fair merger price that considered the difference between the value that a stockholder of Delaware Radiology would receive in Delaware Radiology as a C corporation and the value that a stockholder would receive in Delaware Radiology as an S corporation and applied a type of tax-affecting. Id. at 327. However, the court of chancery did not decide the price that a hypothetical willing buyer would pay a hypothetical willing seller, both having reasonable knowledge of all the relevant facts and neither being under compulsion to buy or to sell that we use in this case.

### d. Conclusion

We conclude that there is insufficient evidence to establish that a hypothetical buyer and seller would tax-affect DGA's earnings and that tax-affecting DGA's earnings is not appropriate.

3.  Whether To Assume DGA Would Reduce Executive
    Compensation

Respondent contends that DGA's projected net income should be increased on the assumption that the Dallas family officers are receiving unreasonable compensation and that those amounts would be reduced voluntarily or as a result of litigation brought by a minority shareholder if a minority block of DGA shares were sold to an unrelated investor.  Respondent relies on AE's report to support this position.  Petitioner contends that AE is incorrect and that DGA's compensation to petitioner and his sons would not decrease after the hypothetical sale, leading to higher income for DGA.

The record does not contain the quality of factual analysis customarily used by courts in deciding whether compensation is reasonable.  Further, there is nothing in the record to suggest that DGA is planning to change how it pays petitioner and his sons.  See Davis v. Commissioner, 110 T.C. 530 (1998).  Thus, we have no more reason to assume changes in DGA's executive compensation policies than we have to assume changes in dividend paying policies or a change in its S corporation status.[12]  On this record we, unlike AE and Empire,[13] do not assume DGA's

---

[12]  We disagree with petitioner's expert Empire on all of these points.

[13]  Empire's position on executive compensation is more
(continued...)

projected profits will increase as a result of reduced compensation to petitioner and his sons after the hypothetical sale of DGA stock.[14]

    4.   Discount for Lack of Control or Minority Interest

        a.   Discount for Lack of Voting Power

MPI did not apply a discount for lack of control or minority interest because it estimated the value of a minority interest of the DGA stock at issue.  However, MPI applied a 5-percent discount for lack of voting power.  Petitioner contends that this discount for lack of voting power is warranted because the stock at issue is nonvoting stock.  Petitioner contends that nonvoting stock is worth less than a minority interest because minority shareholders could pool their votes to influence the S corporation.  Any anticipation of minority shareholders' pooling

---

[13](...continued)
favorable to respondent than MPI's position and fairly similar to AE's position.  One may ask whether respondent viewed Empire's analysis as a concession of the matter.  The record makes clear that respondent did not.  At the start of the trial, petitioner's counsel listed valuation matters in dispute, including the executive compensation issue.  Respondent's counsel concurred that it remained in dispute.  Thus, it is clear that both parties understood that the executive compensation issue remained in dispute and thus were on notice of the need to present evidence relating to that issue.

[14]  We do not consider AE's guideline company and transaction methods because the application of those methods is based on an incorrect assumption that adjustments must be made for executive compensation.  Thus, AE's guideline companies and transaction methods are not comparable to DGA and its methods.

their votes is speculative.  We conclude that no additional discount is warranted for lack of voting power.

   b. <u>Minority Interest Discount for Nonoperating Assets</u>

AE and Empire estimated minority interest discounts of 15 percent for nonoperating assets.[15]  Petitioner does not dispute the appropriateness of a minority interest discount of 15 percent for nonoperating assets.

   c. <u>Minority Interest Discount for Operating Assets</u>

AE applied a 20-percent minority interest discount for operating assets.[16]  Petitioner contends that amount is too low because AE computed it using a formula based on a control premium, and, in estimating the control premium, AE adjusted for excessive executive compensation.  We disagree.  There is no indication that AE based its selection of the control premium on excessive executive compensation.

  5. <u>Discount for Lack of Marketability</u>

Each expert concludes that some discount for lack of marketability is appropriate because there was no ready market for DGA stock on the valuation dates.

---

[15]  MPI did not use a separate minority interest discount for nonoperating assets because MPI used a net asset value approach to value a minority interest and because MPI's method assumed that the DGA stock at issue was for a minority interest.

[16]  MPI did not use a minority interest discount for operating assets because MPI's method assumed that the DGA stock at issue was for a minority interest.

Respondent defends AE's conclusion that a lack of marketability discount of 20 percent is correct. Petitioner agrees with MPI that a lack of marketability discount of 40 percent is correct. We disagree with petitioner.

MPI compiled information from Private Equity Week, a weekly newsletter, on comparable private placements in recent years and found that the mean discount for lack of marketability for restricted stock like DGA's before 1990 was 34.2 percent, from 1990 to 1997 was 20.7 percent, and from 1997 to the present has been 13 percent. MPI used the 34.2-percent discount and adjusted it to 40 percent because DGA stock had no prospect of becoming public in more than 2 years. We believe MPI should have used the discount studies from the period that includes the transactions at issue. The valuation dates are in 1999 and 2000 when, according to MPI, the median lack of marketability discount rate was 13 percent. We conclude that a 20-percent discount for lack of marketability is appropriate.

6. Conclusion as to Fair Market Value of DGA Stock

We calculated the fair market value of DGA stock as follows:[17]

---

[17] This computation is based on AE's capitalization of income approach adjusted for executive compensation. Earnings before interest and tax (EBIT) are adjusted by $1,300 for 1999 and $1,100 for 2000 to correct the adjustment for executive compensation. Each amount (other than percentages and number of shares) in this calculation is multiplied by one thousand.

Total Equity

|  | 1999 | 2000 |
|---|---|---|
| Net sales | $30,867 | $33,225 |
| Adjusted EBIT: | | |
|   $4,600 less $1,300 for 1999 | 3,300 | |
|     and $1,100 for 2000 | | 3,500 |
| Long-term growth rate | 3% | 3% |
| EBIT (next 12 months) | 3,399 | 3,605 |
| Less incremental operating working capital | (148) | (159) |
| Net operating cashflow for capitalization | 3,251 | 3,446 |
| Capitalization rate (16%-3%; 15%-3%) | 13% | 12% |
| Indicated enterprise value (excl. | | |
|   nonoperating assets) | 25,008 | 28,717 |
| Indicated enterprise value (rounded) | 25,000 | 28,700 |
| Plus excess working capital | 1,108 | 623 |
| Fair market value of business enterprise | 26,108 | 29,323 |
| Nonoperating assets | 3,253 | 3,199 |
| Total equity value | 29,361 | 32,522 |
| Total equity value (rounded) | 29,400 | 32,500 |

Discounted Equity

|  | 1999 | 2000 |
|---|---|---|
| Total equity value | 29,400 | 32,500 |
| Discounts for lack of control: | | |
|   Operating assets (20%) | (5,222) | (5,865) |
|   Nonoperating assets (15%) | (488) | (480) |
| As-if freely traded value | 23,690 | 26,155 |
| Discount for lack of marketability (20%) | (4,738) | (5,231) |
| Fair market value of equity | 18,952 | 20,924 |

Fair Market Value Per Share

|  | 1999 | 2000 |
|---|---|---|
| Number of shares | 25,250 | 25,328 |
| Fair market value per share | 751 | 801 |

The fair market value of the DGA stock at issue was $751 per share on November 29, 1999, and $801 per share on November 29, 2000.

D.    Fair Market Value of the 1999 Notes

Respondent determined that the fair market value of each of the 1999 notes was $1,687,704, which is less than face value because they were self-canceling.  Petitioner contends that the

value of each 1999 note was its face value of $2,232,000[18] and the self-canceling clauses should be given no effect.

Petitioner contends generally that the promissory notes used to pay for the stock were not self-canceling because they were ambiguous on that point. We disagree. The notes unambiguously provided that they were self-canceling.

Petitioner contends that we should reform the 1999 notes because inclusion of the self-canceling clauses was a drafting mistake. We disagree. Rosenberg testified that he drafted the 1999 notes and that he meant for the self-canceling clauses to require the 1999 notes to be deemed paid if petitioner died before they were paid. Holt testified that the intent of the clauses was to treat the unpaid portion of the notes as a gift from petitioner to his sons in the event of petitioner's death. Holt's testimony is corroborated by a memorandum to his file dated September 28, 1999.

Petitioner cites cases which involve typographical errors. See, e.g., Woods v. Commissioner, 92 T.C. 776 (1989); Buchine v. Commissioner, T.C. Memo. 1992-36, affd. 20 F.3d 173 (5th Cir. 1994); Atkinson v. Commissioner, T.C. Memo. 1990-37. Those cases have no bearing here because this case involves no typographical errors. Petitioner may not disavow the self-canceling clauses.

---

[18] Petitioner offered no evidence about the value of the 1999 notes.

They are not the result of mistake, undue influence, fraud, or duress.

We conclude on the basis of the foregoing that the self-canceling clauses must be given effect, and that the value of each of the 1999 notes is $1,687,704 as determined by respondent.[19]  To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.

---

[19]  In the opening brief, respondent contended that the share adjustment clauses are void because they are against public policy.  Petitioner did not respond to respondent's argument. We deem this issue conceded because petitioner made no argument about it on brief.  See <u>Chevron Corp. v. Commissioner</u>, 104 T.C. 719, 758 (1995); <u>Remuzzi v. Commissioner</u>, T.C. Memo. 1988-8, affd. without published opinion 867 F.2d 609 (4th Cir. 1989).